69 A.3d 575

LARRY PRICE, PLAINTIFF–APPELLANT, v. HIMEJI, LLC, DEFENDANT–RESPONDENT, AND UNION CITY ZONING BOARD OF ADJUSTMENT, DEFENDANT–RESPONDENT.

Argued November 5, 2012—Decided June 25, 2013.

266

*Larry Price* argued the cause pro se.

*Alain Mulkay* argued the cause for respondent Himeji, LLC (*Mulkay & Rendo,* attorneys).

*Brian M. Chewcaskie* argued the cause for respondent Union City Zoning Board of Adjustment (*Gittleman Muhlstock & Chewcaskie* and *Timothy P. Downs,* attorneys; *Ulysses Isa,* on the brief).

Justice HOENS delivered the opinion of the Court.

This appeal requires the Court to consider two issues relating to applications for zoning variances pursuant to the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –163.

The principal question raised in this appeal is whether an application for a use variance, *see N.J.S.A.* 40:55D–70(d)(1), based on the assertion that the site is "particularly suitable for the proposed use," *see Medici v. BPR Co.*, 107 *N.J.* 1, 4, 526 *A.*2d 109 (1987), requires proof that the project must be built on that site because it is the only one available. This issue arises because the Law Division interpreted the particularly suitable standard to require such proof and, as the applicant had not proven that there was "no other viable location" where its project could be built, overturned the Zoning Board's grant of a use variance.

The Appellate Division disagreed with the Law Division's analysis, concluding that particular suitability is a more flexible concept and that the trial court had misinterpreted its meaning by construing it too narrowly. Applying its understanding of the standard, the appellate panel reversed, finding that the applicant's evidence was uncontested and that the Zoning Board's resolution set forth detailed findings of fact that supported the conclusion that the property was particularly suited for the proposed use.

Because the two different interpretations of the particularly suitable standard utilized by the trial court and the Appellate Division led those courts to reach opposite conclusions, we are required to more specifically articulate the meaning and intent of the standard to be applied.

The second question presented in this appeal arises because the trial court, after concluding that the proofs were inadequate to support the grant of a use variance, declined to consider several other challenges that had been raised by the complaint filed in the action in lieu of prerogative writs. These challenges addressed the Zoning Board's resolution granting additional variances for the project relating to density, *N.J.S.A.* 40:55D–70(d)(5), height, *N.J.S.A.* 40:55D–70(d)(6), and bulk, *N.J.S.A.* 40:55D–70(c)(2), as well as a waiver to reduce the required number of parking spaces.

The Appellate Division, after reversing the trial court's denial of the application for a use variance, exercised its original jurisdiction and decided the further challenges to the decision of the Zoning

Board on the merits. In summary fashion, the panel concluded that the Zoning Board's grant of the additional variances and the waiver was not arbitrary, capricious or unreasonable.

This appeal, therefore, also calls upon us to evaluate whether the Appellate Division erred in the exercise and performance of its original jurisdiction or whether it was required to remand the further challenges to the Law Division for its consideration.

## I.

Defendant Himeji, LLC owns a parcel of land in Union City, which it created by acquiring and aggregating four contiguous lots. The parcel is located between, and has frontage on, both Palisade Avenue and Manhattan Avenue, two of the city's major thoroughfares. As a result, the parcel is commonly referred to as a through lot. There are three small existing residential buildings on the site.

The parcel is located in the R zone, a Mixed Residential District, in which one- to four-family dwellings and row houses are among the permitted uses. In addition, certain higher-density uses, including public housing for senior citizens, rooming houses and certain multi-family developments are identified as conditional uses in the zone. In general, the R zone imposes a height restriction of forty feet and limits development to three-story buildings of no more than thirty units per acre.

However, the property is also situated at the edge of the R zone, a location that places its Manhattan Avenue side directly across from the R–MF zone (Residential Multi–Family District). In that zone, high-rise buildings are permitted, and there are many such buildings across Manhattan Avenue from the Himeji property in the R–MF zone. In addition, there are several residential buildings of four to six stories located in the R zone on parcels surrounding the property in issue, the majority of which exceed the R zone's permitted maximum height of forty feet.

Finally, the parcel is located in the Steep Slope Overlay District (SSOD), which makes it subject to the requirements of the Steep Slope Ordinance. The slope that affects the property is a man-made condition, which causes the side of the property located on Palisade Avenue to be approximately eighteen feet higher than the side that fronts on Manhattan Avenue. The Steep Slope Ordinance further restricts development of the property by limiting lot coverage to forty percent of maximum, and by reducing the permissible number of units to a total of twelve per acre.

Taken together, based on the parcel's size, the restrictions imposed on development of Himeji's property by operation of the R zone and the SSOD would only permit construction of 4.6 units, even though there are already a total of ten units spread among the three existing buildings on the lots that, in the aggregate, comprise the property.

## A.

Himeji filed an application with the Union City Zoning Board seeking permission to demolish the three existing multi-unit residential buildings on the property and replace them with a single new multi-unit residential building. As originally proposed, the new building would include five and one-half stories for residential use and three floors for parking. The building would have been eighty feet in height on the Manhattan Avenue side and, because of the slope, sixty-three feet in height on the Palisade Avenue side. The building would have covered ninety percent of the property with no setbacks on either Palisade Avenue or Manhattan Avenue.

As a result, the proposed project required Himeji to seek approval of several variances. Accordingly, Himeji filed its application for a use variance, *N.J.S.A.* 40:55D–70(d)(1); a density variance, *N.J.S.A.* 40:55D–70(d)(5); a height variance, *N.J.S.A.* 40:55D–70(d)(6); as well as bulk variances, *see N.J.S.A.* 40:55D–70(c)(2), relating to lot area, lot coverage, building length, and front-, side-, and rear-yard setbacks. In addition, Himeji requested a waiver from the requirement imposed by the Residential Site

Improvement Standards (RSIS), *N.J.S.A.* 40:55D–40.1 to –40.7; *N.J.A.C.* 5:21–1.1 to –8.1, relating to the proposed number of parking spaces.

The Zoning Board held hearings on June 4 and July 9, 2009. During the June 2009 hearing, Himeji presented expert testimony from an engineer, an architect, and a traffic consultant, each of whom spoke in support of the requested variances. In addition, the applicant presented a planning expert who offered nine reasons in support of his opinion that the aggregated parcel was particularly suitable for the proposed project and that the proposed development was generally consistent with the municipality's Master Plan.

The expert planner explained that the property was particularly well suited for the proposed development because it is an amalgamation of four contiguous lots, is a through lot with frontage on two major roads, and is oversized in comparison to nearby parcels. He pointed out that the building would be situated immediately adjacent to the R–MF zone, where high-rise, multi-family construction is permitted and where there are already several buildings of like size and dimension. He also observed that, even in the R zone, there are a number of existing residential buildings of similar height and scope, all of which are near the parcel on which this project would be built, and one of which was permitted to be built based on the grant of a use variance. According to the planner's estimates, only thirty percent of the nearby residential structures located in the R zone complied with the existing height requirement.

The planner also testified about the property's significance as it related to the SSOD requirements. He referred to the parcel as "unique, from a point of view that it is not steeply sloped[.]" He explained that although a steep slope designation generally involves a fifteen or twenty percent slope gradient, this parcel has a slope of only approximately ten percent. Moreover, he pointed out that the slope is manmade, the result of previous development in the area rather than being part of the natural slope of the

Palisade Cliff, where rock might be exposed. He testified that, when compared to the limitations imposed by the SSOD, the property was already nonconforming because it was developed with ten units where only 4.6 would be permitted.

During the June 4, 2009, hearing, two members of the public who reside near the property testified in support of the project. Plaintiff Larry Price, who also resides in the area, was permitted to cross-examine Himeji's witnesses. Price used that opportunity to express his opposition to the application but did not testify or call any expert witnesses to challenge Himeji's proofs.

At the end of the first day of hearings, the Board did not vote on the application but instead asked Himeji to accommodate several concerns it had about the project. Himeji complied with each of those requests, presenting its redesign for the project and offering additional testimony from each of its experts at the July 2009 hearing. As finally proposed, the building was redesigned to lower its height so that it would be only five stories above grade from Palisade Avenue. In addition, the redesigned building would have sixty residential units on four of the above-grade floors, and a total of ninety-five parking spaces on the lowest above-grade level and the two sub-grade parking levels.

On July 9, 2009, the Board heard testimony concerning the redesigned plan from all of Himeji's experts, from members of the public who supported the project, and from Price, who again was permitted to cross-examine the experts and who continued to oppose the application. Thereafter, the Zoning Board voted to approve Himeji's modified application, to grant all of the requested variances, to authorize the RSIS waiver, and to approve the site plan.

On September 10, 2009, the Board adopted a comprehensive resolution setting forth its findings, its analysis, and the reasons for its determination to grant each aspect of the application. Because the resolution is critical to our review of the matters raised on appeal, we describe it at length.

The resolution first described the property and the applicant's proposal both in its original form and as it was revised following the June hearing. It next identified each of the variances and waivers that would be needed to permit the project to be built. The resolution then summarized the evidence presented at the hearing, including the testimony offered in support of the application by each of the expert witnesses called by Himeji, the supporting comments offered by the two members of the public, and the opposition to the project that Price raised.

Thereafter, the Board set forth its findings of fact and conclusions of law in support of its decision to grant all of the requested variances and the waiver. Beginning with an explanation of its understanding of the governing principles of law, the Board then turned to its evaluation of the positive and negative criteria. It recognized that, because the proposed use was not inherently beneficial, Himeji was required to prove that it would serve the general welfare because it is "peculiarly fitted to the particular location for which the variance is sought."

The Board observed that the parcel is in the R zone, consists of the amalgamation of four lots, exceeds the minimum lot size, and is located close to mass transit. It reasoned that, although the use was not permitted in that zone, the parcel is across the street from the R–MF zone where the use is permitted. Acknowledging that the parcel would be undersized as compared to the R–MF zone requirements, the Board observed that it is "fully familiar with the site in question and . . . that the total square footage of the site is adequate to accommodate the density and height of the building."

The Board's resolution specifically incorporated the reasons that Himeji's planning expert had given to support his opinion that the property is particularly suited for the proposed use. As articulated in the resolution, the reasons were:

1. The subject property is located at the narrowest portion of the Steep Slope Overlay zone and the slope is manmade. The Steep Slope Overlay zone includes properties between Palisades Avenue on the west and Manhattan Avenue towards the east. The subject property is located [at] the narrowest portion of the zone and has a slope of only ten percent, which is manmade.

2. The subject property is located at the edge of the "R" zone adjacent to the "RMF" zone on the easterly side of Manhattan Avenue. The "RMF" zone permits high rise dwelling. Thus, the subject site is not located directly in the middle of the "R" zone.

3. In the immediate area of the subject property and located in the "R" zone, there are several existing mid to high-rise developments with similar heights between four to six stories.

4. The subject property ... has a total square footage of 16,779 square feet. The Board acknowledges that the minimum lot coverage for high rise development is 20,000 square feet. However, the Board feels that the assemblage [of] four contiguous lots totaling the 16,779 square feet can accommodate the proposed use.

5. The property has a unique characteristic since it has dual frontage on Palisade Avenue and Manhattan Avenue. This enabled the applicant to have a degree of design flexibility. Also, the majority of the properties to the north of the subject site are split down the middle of the block and are not through lots. Towards the south side of the subject lot, the lots are through lots and are able to accommodate the multifamily developments similar to the proposed project.

6. The property has only a ten percent slope versus the thirty percent slopes in the areas of the Palisades escarpment in the "RMF" zone to the east of the subject property. The property has [no] exposed rock on the property. It is located on the edge of the steep slope overlay zone.

7. The property has primary frontage along Palisade Avenue, a major north-south corridor with a wide right of way of eighty feet. This enables the similar height of the proposed project to be well separated from the six story building directly across the street.

8. The existing on-site development includes ten non-conforming units in need of substantial rehabilitation or redevelopment.

9. The property is not located on the Palisades Cliff face and is developed with a [manmade] slope.

Addressing more specifically the required analysis of the positive criteria, the Board found that the proposed development satisfied numerous purposes of the MLUL. Specifically, the Board found the proposed development: would promote the public and general welfare by providing newer housing, which is needed for the municipality's growing population; would be a new state of the art building similar in height to surrounding buildings, promoting a desirable visual environment; and would have a positive impact on the flow of traffic in the area because access to the property would be limited to Manhattan Avenue, thereby eliminating three curb cut-outs on Palisade Avenue and creating additional street parking.

As further support, the Board noted that according to the available data from 2000, Union City was the second most populous municipality in Hudson County, comprised largely of families residing in overcrowded housing stock and where the vacancy rate is extremely low, resulting in a great need for newer housing. Finally, the Board concluded that the proposed development would promote the general welfare by advancing the goals of the State Development and Redevelopment Plan (State Plan). The Board explained that, because the State Plan designates Union City as being in a "Planning Area 1–Metropolitan" area, the development would serve the Plan's goal of redirecting the population to urban areas where infrastructure and services already exist.

Turning to the required evaluation of the negative criteria, the Board acknowledged that the use variance could not be granted unless it could be accomplished without substantial detriment to the public good and without substantially impairing the intent and purpose of the zone plan and zoning ordinance. Moreover, the Board recognized that it was required to evaluate the negative criteria in accordance with an enhanced quality of proofs.

In support of its conclusion that the proposal satisfied the first aspect of the negative criteria, the Board found that the proposed development will provide adequate off-street parking and will conform to the character of the neighborhood because it will be similar in height to nearby buildings and will not detrimentally impact light, air and open space.

In considering the effect of the proposed project on the overall zone plan, the Board reviewed and analyzed the Master Plan that had been recently adopted. Although recognizing that the Master Plan had not altered the parcel's applicable zone, the Board used a "site specific approach." It observed that the municipality is a "built-out community" where "[o]nly three percent of the total number of parcels in the entire City are vacant ... [and where] the majority of newer housing results from redevelopment of parcels as opposed to development of vacant parcels."

In particular, the Board identified several goals of the Master Plan that would be served by the proposed development, observing that it would

[p]rovide a balance of land uses and balance development patterns in appropriate locations in order to:

preserve the character of the community; encourage economic development;

protect and preserve the established residential character;

provide a broad range of housing choices; and

improve the quality of life of the residents of Union City.

Furthermore, the Board reasoned that the proposed project would advance objectives that complement the stated goals of the Master Plan in a wide variety of ways. It specifically found that the project would enhance the City's streetscape program, promote stable neighborhoods, increase community pride, eliminate substandard property, provide adequate parking, incorporate parking design into the project, ensure neighborhood compatibility, and maintain consistency with land use patterns.

Having concluded that granting the use variance was warranted by its analysis of the positive and negative criteria, the Board addressed the height, *N.J.S.A.* 40:55D–70(d)(6), density, *N.J.S.A.* 40:55D–70(d)(5), and bulk variances, *N.J.S.A.* 40:55D–70(c)(2), as well as the parking waiver needed for the proposed development. Relying on Appellate Division authority, *see Puleio v. N. Brunswick Twp. Bd. of Adjustment,* 375 *N.J.Super.* 613, 868 *A.*2d 1114 (App.Div.), *certif. denied,* 184 *N.J.* 212, 876 *A.*2d 285 (2005),[1] the Board concluded that the height and density variances were to be decided based on an evaluation of whether the applicant's proofs demonstrate that the site will accommodate the problems associated with a greater density and height than is otherwise permitted by the ordinance, but that the bulk variances were essentially subsumed within the consideration and grant of the use variance. Applying these criteria, the Board found ample support in the

---

[1] Although the Zoning Board also relied in part on the articulation of the applicable standard found in an unpublished Appellate Division decision "involving two of the same parties," we neither recite nor consider that source in light of *Rule* 1:36–3.

record for each of the requested variances and it concluded that, in light of the proximity to public transportation, the proposed on-site parking was sufficient to permit a waiver of the ordinarily applicable RSIS requirements. Therefore, the Zoning Board approved Himeji's application and granted all of the requested relief.

### B.

Plaintiff filed a complaint to pursue an action in lieu of prerogative writs in the Superior Court, Law Division, seeking to set aside the Zoning Board's determination. He alleged generally that Himeji failed to meet its burden of proof and that the Board's approval of the variances was contrary to the dictates of the MLUL.

In addition to a general allegation that the action of the Zoning Board was arbitrary, capricious and unreasonable, the complaint raised seven specific claims for relief. These were that Himeji did not demonstrate that the property was particularly suitable for the proposed use, see *N.J.S.A.* 40:55D-70(d)(1); that the applicant failed to meet the enhanced quality of proofs, see *N.J.S.A.* 40:55D-70(d)(1); that the application failed to provide special reasons for the Floor Area Ratio (FAR)[2] variance, see *N.J.S.A.* 40:55D-70(d)(4); that the applicant failed to demonstrate adequate special reasons for the density variance, see *N.J.S.A.* 40:55D-70(d)(5); that the applicant failed to prove adequate special reasons for the height variance, see *N.J.S.A.* 40:55D-70(d)(6); that the applicant failed to demonstrate that the variances for lot size, lot coverage, front-, side- and rear-yard setbacks and the parking waiver would advance the purposes of the MLUL or that the benefits of those deviations would substantially outweigh their detriments, see *N.J.S.A.* 40:55D-70(c)(2); and that the applicant failed to demonstrate that the variances would not substantially impair the intent

---

[2] Himeji's application did not include a request for a (d)(4) FAR variance, and the Zoning Board did not consider or grant one. We therefore will not address that argument and we include that aspect of the complaint only for the sake of creating a complete record.

and purpose of the zone plan and zoning ordinance, *see N.J.S.A.* 40:55D–70.

By order dated April 21, 2010, the Law Division reversed the resolution of the Zoning Board that had approved Himeji's variance application. In the accompanying written statement of reasons, the trial court focused on Himeji's application for a use variance, concluding that the Board's finding that the property was particularly suitable for the proposed use was arbitrary, capricious and unreasonable. That conclusion was based on the trial court's understanding of the proofs required to meet the test for particular suitability and drew support from authority found in an opinion of this Court.[3] As the trial court described the meaning of particular suitability,

> [i]t is necessary for the Board to find that "the particular site *must* be the location for the variance." *Fobe Assocs. v. Mayor of Demarest,* 74 *N.J.* 519, 534 [379 *A.*2d 31] (1977) [ (emphasis in original), *overruled in part, S. Burlington County NAACP v. Twp. of Mt. Laurel,* 92 *N.J.* 158, 240 n. 15, 456 *A.*2d 390 (1983).] That is to say, that there is "no other viable location" for the proposed use.

Finding that the evidence in the record failed to demonstrate that "the proposed site *must* be the location for the project" or that the potential benefits of increased housing could not otherwise be attained, the trial court concluded that the Zoning Board had erred. In the trial court's analysis, the record fell short because the expert testimony did

> not address the particular suitability of the site in so far as the site is the *only* location available for the project, that there are no other locations possible (locations that might not require so many and such extensive variances)[, that it] speaks to the adequacy of the site for the project [but] does not address the necessity of the site for the project[, and because n]o evidence is offered as to the suitability of other sites or the lack of other sites.

Based on that understanding of the law, the trial court reversed the Board's decision, observing that there was insufficient evidence to support the grant of the use variance. Having decided

---

[3] Like the Zoning Board, the trial court found support in an unpublished opinion of the Appellate Division that also involved two of the parties to this dispute. We decline to consider that decision in light of *Rule* 1:36–3.

the matter based on that threshold issue, the court did not address the other claims that plaintiff had raised in the complaint. The trial court thereafter denied Himeji's motion for reconsideration and for a remand to the Board for an opportunity to supplement the record.

Himeji filed an appeal from the trial court's orders reversing the Board's approvals and denying the motion for reconsideration and a remand. Recognizing that the Appellate Division would utilize the same standard of review as had the trial court, Himeji did not limit the focus of its appeal to the application for a use variance, but instead addressed all of the issues that had been raised in plaintiff's complaint. The Board joined in the arguments that Himeji raised on appeal.

In particular, Himeji and the Zoning Board argued that the trial court erred when it required Himeji to establish that its application for a use variance based on particular suitability was supported by proof that the property must be the site for the project and that no other viable location existed. More generally, however, Himeji addressed each of the other aspects of the application that the Board had considered, identifying the factual and legal sufficiency of the record relating to the Board's grants of variances for height, density and bulk, as well as the parking waiver.

Plaintiff's brief on appeal focused only on the issue relating to the application for a use variance and urged the Appellate Division to affirm the trial court's decision. In taking that approach, plaintiff did not separately address the other variances and the waiver that the Board had granted.

In an unpublished opinion, the Appellate Division reversed the trial court and reinstated the Zoning Board's resolution approving the proposed development. The panel concluded that the trial court had interpreted the particularly suitable requirement too narrowly and that it had therefore misconstrued its meaning when particular suitability is used as a special reason for granting a use variance. Quoting this Court's observation that " '[s]pecial reasons' is a flexible concept[,]" *see DeSimone v. Greater Englewood*

*Hous. Corp.,* 56 *N.J.* 428, 440, 267 *A.*2d 31 (1970), the Appellate Division reasoned that an application for a variance requires evaluating the specific facts and circumstances in light of the zoning ordinance and the purposes found in the MLUL. Applying that standard, the panel found that Himeji had presented uncontested evidence that supported the Board's detailed factual findings that the property was particularly suited for the proposed use and that those findings were entitled to the court's deference.

The appellate panel, therefore, reversed the trial court's order invalidating the Board's grant of the use variance, but it did not remand the matter to the trial court for resolution of the other issues raised in plaintiff's complaint. Instead, the Appellate Division summarily rejected all of plaintiff's other arguments, concluding that "Himeji proved 'special reasons' for the granting of the use, density, and height variances." We thereafter granted plaintiff's petition for certification. 209 *N.J.* 96, 35 *A.*3d 679 (2011).

## II.

Before this Court, plaintiff raises three arguments in support of his request that the judgment of the Appellate Division be reversed. First, he asserts that the Appellate Division's interpretation of particular suitability conflicts with controlling decisions of this Court and with published Appellate Division opinions. In plaintiff's view, the appellate court erred by replacing an established bright-line test for particular suitability with a relaxed and vague set of criteria. He asserts that this interpretation, if uncorrected, threatens to undermine the Union City zoning plan by delegating to the Zoning Board, to trial judges, and to appellate courts, excessive authority to depart from that established plan.

Plaintiff's two other arguments are closely related. In essence, he contends that the Appellate Division erred in failing to remand the matter to the trial court for consideration of the challenges he had raised relating to the other variances that the Zoning Board

had approved but that the trial court did not reach.[4] He asserts that the Appellate Division deprived him of due process by denying him an opportunity to have those arguments heard and decided. He further faults the panel because its opinion did not specify the findings of fact and conclusions of law on which its decision on those issues was based. *See R.* 1:7–4(a) (requiring court, when sitting without jury, to state findings of fact and conclusions of law). In a related argument, plaintiff challenges the Appellate Division's implicit exercise of original jurisdiction to decide these issues, asserting that it was improper to do so when there was no imperative need for action.

Himeji and the Zoning Board present this Court with nearly identical arguments in support of an affirmance of the Appellate Division's judgment. First, they argue that there is no conflict with decisions of this or any other court because the panel, relying on the uncontested evidence in the record, found that this dispute was factually distinguishable from prior decisions on which the trial court had relied. As part of this argument, Himeji and the Board assert that the appellate court did not relax the particularly suitable test, but instead reviewed the applicable cases establishing the standard, correctly concluded that the trial court's interpretation of that standard was in error, and then found that Himeji's ample proofs met the standard this Court had established.

Second, Himeji and the Board argue that the appellate court did not deprive plaintiff of due process. They point out that plaintiff had an opportunity to be heard before both the Board and the trial court. They contend that plaintiff was on notice that Himeji had asked the Appellate Division to exercise its original jurisdiction to decide all of the issues plaintiff had raised at the trial level.

---

[4] The petition for certification includes a description of the claims that plaintiff asserts were raised in his complaint but not decided by the trial court. That description, however, does not coincide with the counts in the complaint and omits the challenges originally raised to the grant of the (c)(2) bulk variances and the parking waiver.

Himeji therefore asserts that plaintiff was afforded the opportunity to advance his cause at the appellate level through his brief and oral argument, but chose not to do so because he contended that the additional issues were irrelevant on appeal. Moreover, Himeji argues that the Appellate Division's exercise of original jurisdiction to decide the issues that the trial court had not addressed was warranted because there were no facts in dispute and because the standard of review of the Board's decision was the same at both the trial and appellate levels. *See Vas v. Roberts*, 418 *N.J.Super.* 509, 523-24, 14 *A.*3d 766 (App.Div.2011) (finding exercise of original jurisdiction proper when issue is matter of public interest and one purely of law, involves no disputed facts, and if resolution of dispute without need for remand would terminate matter and avoid unnecessary further litigation). Himeji therefore asserts that the Appellate Division correctly exercised its original jurisdiction as a way to achieve the judicial system's goals of efficiency, finality, and fairness.

Finally, Himeji and the Board disagree with plaintiff about the adequacy of the Appellate Division's opinion on these issues. They assert that the panel's opinion thoroughly reviewed the evidence presented to the Board, recognized that the proposed development required use, height, density and bulk variances, and correctly concluded that the Board's decision to grant the application in its entirety was supported by the record and was not arbitrary, capricious or unreasonable.

## III.

We divide our discussion of the issues raised on appeal into two sections. First, we consider the meaning of the particularly suitable standard for grant of a use variance. Second, we address whether the Appellate Division inappropriately exercised its original jurisdiction or denied plaintiff due process of law when it elected to decide, rather than remand, plaintiff's challenges to the Board's grant of variances other than the use variance.

## A.

Our consideration of the appropriate standard to be applied in the context of an application for a use variance requires us to begin with a brief recitation of the governing principles derived from the MLUL and from our well-settled case law.

We recently explained that municipalities are authorized to impose conditions on the use of property through zoning by a "delegation of the police power" that must "be exercised in strict conformity with the delegating enactment—the MLUL." *Nuckel v. Borough of Little Ferry Planning Bd.*, 208 *N.J.* 95, 101, 26 *A.*3d 418 (2011) (citing *Riggs v. Twp. of Long Beach*, 109 *N.J.* 601, 610, 538 *A.*2d 808 (1988)). The MLUL exhibits a preference for municipal land use planning by ordinance rather than by variance, *Medici, supra,* 107 *N.J.* at 5, 526 *A.*2d 109, which is accomplished through the statute's requirements that use variances be supported by special reasons, *see Nuckel, supra,* 208 *N.J.* at 102, 26 *A.*3d 418 (citing *N.J.S.A.* 40:55D–70(d)), and by proof of the negative criteria, *ibid.* (quoting *N.J.S.A.* 40:55D–70). The MLUL, therefore, although authorizing zoning boards to grant use variances, carefully defines the grounds on which that authority may be exercised. *Ibid.*

We have long recognized that zoning boards, "because of their peculiar knowledge of local conditions[,] must be allowed wide latitude in the exercise of delegated discretion." *Kramer v. Bd. of Adjustment,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965); *accord Jock v. Zoning Bd. of Adjustment,* 184 *N.J.* 562, 597, 878 *A.*2d 785 (2005). That board's decisions enjoy a presumption of validity, and a court may not substitute its judgment for that of the board unless there has been a clear abuse of discretion. *Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment,* 172 *N.J.* 75, 81, 796 *A.*2d 247 (2002). In evaluating a challenge to the grant or denial of a variance, the burden is on the challenging party to show that the zoning board's decision was "arbitrary, capricious, or unreasonable." *Kramer, supra,* 45 *N.J.* at 296, 212 *A.*2d 153.

■ Although our standard of review is a deferential one, the board "may not, in the guise of a variance proceeding, usurp 'the legislative power reserved to the governing body of the municipality to amend or revise the [zoning] plan....' " *Feiler v. Fort Lee Bd. of Adjustment,* 240 *N.J.Super.* 250, 255, 573 *A.*2d 175 (App. Div.1990) (quoting *Leimann v. Bd. of Adjustment,* 9 *N.J.* 336, 340, 88 *A.*2d 337 (1952)), *certif. denied,* 127 *N.J.* 325, 604 *A.*2d 600 (1991). This is of particular concern when a zoning board considers a use variance because, "as the term implies, [it] permits a use of land that is otherwise prohibited by the zoning ordinance." *Nuckel, supra,* 208 *N.J.* at 101, 26 *A.*3d 418.

We have explained that the MLUL "requires an applicant to prove both positive and negative criteria to obtain a use variance." *Smart SMR of New York, Inc. v. Fair Lawn Bd. of Adjustment,* 152 *N.J.* 309, 323, 704 *A.*2d 1271 (1998); *accord Sica v. Bd. of Adjustment,* 127 *N.J.* 152, 156, 603 *A.*2d 30 (1992). The requirement that a use variance be based on proof of the positive criteria arises from the language of the MLUL, which limits the grant of a use variance to those cases in which there is a showing of "special reasons." *N.J.S.A.* 40:55D–70(d).

The MLUL does not define special reasons, but "subsequent judicial interpretations have 'infus[ed] substantive meaning into the "special reasons" standard.' " *Coventry Square, Inc. v. Westwood Zoning Bd. of Adjustment,* 138 *N.J.* 285, 295, 650 *A.*2d 340 (1994) (quoting *Medici, supra,* 107 *N.J.* at 11, 526 *A.*2d 109). In particular, we have held that the term " 'special reasons' takes its definition and meaning from the general purposes of the zoning laws," *Burbridge v. Twp. of Mine Hill,* 117 *N.J.* 376, 386, 568 *A.*2d 527 (1990) (citing *Kohl v. Mayor of Fair Lawn,* 50 *N.J.* 268, 276, 234 *A.*2d 385 (1967)), that have been specifically identified by the Legislature, *ibid.* (outlining general purposes of MLUL identified in *N.J.S.A.* 40:55D–2).

■ Although we have observed that "special reasons exist whenever a variance proposes to secure any of the statutory zoning goals," *ibid.; see Kramer, supra,* 45 *N.J.* at 287, 212 *A.*2d

153 (explaining that "the question is whether the special reasons, *taken as a whole*, are founded affirmatively in one or more of the zoning objectives set forth in [the MLUL]"), it remains the applicant's burden to prove special reasons because the grant of a use variance always represents an exception to the generally applicable zoning scheme, *see Funeral Home Mgmt., Inc. v. Basralian*, 319 *N.J.Super.* 200, 207, 725 *A.*2d 64 (App.Div.1999) (observing that, because of Legislature's strong policy preference for planning by ordinance, "only exceptional cases warrant use variances").

Proof of the negative criteria requires the applicant to demonstrate, in accordance with the enhanced quality of proof, *see Medici, supra,* 107 *N.J.* at 21, 526 *A.*2d 109, both that the variance "can be granted without substantial detriment to the public good" and that it "will not substantially impair the intent and the purpose of the zone plan and zoning ordinance," *N.J.S.A.* 40:55D–70; *see Sica, supra,* 127 *N.J.* at 156, 603 *A.*2d 30. The showing required to satisfy the first of the negative criteria focuses on the effect that granting the variance would have on the surrounding properties. *Medici, supra,* 107 *N.J.* at 22 n. 12, 526 *A.*2d 109. The proof required for the second of the negative criteria must reconcile the grant of the variance for the specific project at the designated site with the municipality's contrary determination about the permitted uses as expressed through its zoning ordinance. *Id.* at 21, 526 *A.*2d 109.

With that analytical framework to guide us, we address the central contention raised by the parties to this appeal. An applicant seeking a use variance, *N.J.S.A.* 40:55D–70(d)(1), is required to prove the positive criteria by demonstrating one of the special reasons. Although we have recently observed that there are three categories of circumstances that constitute special reasons for a (d)(1) use variance, *see Nuckel, supra,* 208 *N.J.* at 102, 26 *A.*3d 418 (quoting *Saddle Brook Realty, L.L.C. v. Twp. of Saddle Brook Zoning Bd. of Adjustment,* 388 *N.J.Super.* 67, 76, 906 *A.*2d 454 (App.Div.2006)), only one of them is implicated in this

appeal. We focus, therefore, solely on the special reason we have described as being "that the use promotes the general welfare because the proposed site is particularly suitable for the proposed use." *Medici, supra,* 107 *N.J.* at 4, 526 *A.*2d 109.

In short, the question before this Court is whether, as the trial court understood it, the particularly suitable standard requires proof that the site be the only possible location for the particular project, *see Fobe, supra,* 74 *N.J.* at 534, 379 *A.*2d 31; *Kohl, supra,* 50 *N.J.* at 268, 234 *A.*2d 385, or whether, as the appellate panel reasoned, the standard is met by employing a more flexible, site-specific approach, *see Medici, supra,* 107 *N.J.* at 18, 526 *A.*2d 109; *DeSimone, supra,* 56 *N.J.* at 440, 267 *A.*2d 31. This matter therefore requires that we explain the meaning and intent of the particularly suitable standard in an effort to provide clarity to this important area of zoning law.

■ An application for a use variance based on the assertion that a property is particularly suitable for a project requires an evaluation of whether the use, otherwise not permitted in the zone, when authorized for the particular parcel, will promote the general welfare as defined by the MLUL. In our efforts to give content to that standard, this Court has used several articulations to explain its meaning and intent.

We have held that particularly suitable means that "the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought." *Kohl, supra,* 50 *N.J.* at 279, 234 *A.*2d 385. We have observed that, in the context of the specific parcel, it means that strict adherence to the established zoning requirements would be less beneficial to the general welfare. *See Kramer, supra,* 45 *N.J.* at 290–91, 212 *A.*2d 153. We have commented that an application demonstrates a special reason if there is proof that "the subject property was particularly suitable for the proposed use." *Medici, supra,* 107 *N.J.* at 24, 526 *A.*2d 109.

At the same time, we have recognized that almost all lawful uses of property can be said to promote the general welfare to some degree, with the result that if general societal benefit alone constituted "an adequate special reason, a special reason almost always would exist for a use variance." *Kohl, supra,* 50 *N.J.* at 280, 234 *A.*2d 385. As a result, any application for a use variance based on the particularly suitable standard has always called for an analysis that is inherently site-specific. *See, e.g., Stop & Shop Supermarket Co. v. Bd. of Adjustment of Springfield,* 162 *N.J.* 418, 431, 744 *A.*2d 1169 (2000) (commenting that applicant must typically rely on particular suitability due to special characteristics of property or undue hardship to adapt property to conforming use); *Medici, supra,* 107 *N.J.* at 18, 526 *A.*2d 109 (explaining that, because commercial uses generally do not qualify as inherently beneficial, "any benefit to the general welfare derives not from the use itself but from the development of a site in the community that is particularly appropriate for that very enterprise").

Moreover, in our review of the application of the particularly suitable standard, we have looked with care at the reasons articulated by the zoning board to evaluate whether its decision was consistent with the purposes to be advanced by the MLUL. For example, we sustained the grant of a use variance that allowed the replacement of a deteriorating beach-front hotel in a residential zone with a new, more attractive, modern motel. *Kramer, supra,* 45 *N.J.* at 296–97, 212 *A.*2d 153. In doing so, we agreed that the property was particularly suitable for that purpose because it was both ideally situated for a seashore resort, *id.* at 295–96, 212 *A.*2d 153, and was unsuitable for the permitted residential development because most of it lacked access to the waterfront, *id.* at 290, 212 *A.*2d 153.

Detailed factual findings that distinguish the property from surrounding sites and demonstrate a need for the proposed use may help to establish that the property is "particularly suitable" for the proposed use and a lack of such findings may be fatal when tested on review.

For example, the grant of a use variance to build a motel in a community that prohibited them entirely, and that was based on a general conclusion that there was a "need for good motel accommodations" in the community, failed to demonstrate that the property was "particularly suitable" for the motel. *Medici, supra,* 107 *N.J.* at 8, 24, 526 *A.*2d 109. Although the record indicated the property had a unique shape and was in close proximity to a highway and to commercial development, *id.* at 6–7, 526 *A.*2d 109, there was no evidence that there was inadequate hotel capacity in the community or that the additional proposed motel rooms would constitute a benefit to the general welfare, *id.* at 24, 526 *A.*2d 109. In concluding that the proofs in the record were inadequate to establish that the subject property was "particularly suitable" for the proposed use, we commented that merely being located near a highway did not distinguish the proposed site from any other property in the vicinity of the highway. *Id.* at 24–25, 526 *A.*2d 109.

Similarly, in dealing with proposed expansions of existing nonconforming commercial uses, we have been vigilant about our examination of the record for adequacy of proofs. *See Burbridge, supra,* 117 *N.J.* at 395, 568 *A.*2d 527. In that context, we have observed that an applicant can prove that the proposed use is "particularly suitable" if the public benefit derived from the proposed use could only be gained through a grant of a variance at the location or that the community was dependent on the grant of a variance for the proposed use. *Ibid.* That is, we have been unwilling to permit the applicant to rely solely on the alleged benefits of a business to the general welfare as sufficient to constitute a special reason under the MLUL. *Id.* at 396, 568 *A.*2d 527. Instead, we have taken a more site-specific approach, considering the relationship between the particular property and the community where it is located. *Id.* at 395, 568 *A.*2d 527.

In applying that approach in *Burbridge,* we considered the proposed expansion of an auto-salvage business, which was an existing nonconforming use located in a residential zone. We concluded that the record did not establish that the public benefit

derived from recycling automobiles could only be gained through an expansion of the business on the applicant's property or that there was any demonstration that the community depended upon the applicant for its supply of recycled auto parts. *Id.* at 395–96, 568 *A*.2d 527.

By analogy, our decisions relating to wireless telecommunications facilities make clear that the relative location of the proposed site and the community's need for the proposed use are relevant factors in determining "particular suitability." *See New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adjustment,* 160 *N.J.* 1, 14–15, 733 *A*.2d 442 (1999) (concluding that need to address inadequacy of coverage capacity and location in industrial zone between highway and railroad made site "particularly appropriate"); *Smart SMR, supra,* 152 *N.J.* at 321, 704 *A*.2d 1271 (concluding that proposed location, where monopole already existed, in centrally located industrial zone, was particularly suitable for taller monopole).

### B.

Central to the trial court's approach to evaluating the Board's decision to grant a (d)(1) use variance was its reliance on a quotation found in an opinion of this Court to the effect that particular suitability demands proof that the proposed location is the only one available. *Fobe, supra,* 74 *N.J.* at 534, 379 *A*.2d 31; *see Kohl, supra,* 50 *N.J.* at 270–71, 234 *A*.2d 385. We turn, then, to the source of that quotation and the context in which this Court intended that it be understood.

Three separate opinions formed the basis for the trial court's conclusion that demonstration of particular suitability required proof that the property be the "only" possible location for the proposed project. The earliest of the three, *Mocco v. Job,* 56 *N.J.Super.* 468, 153 *A*.2d 723 (App.Div.1959), involved the grant of a use variance to expand a previously existing nonconforming commercial use. More specifically, the owner of a tavern located in a residential neighborhood with a small dining area on the

second floor sought a use variance to expand that area to accommodate dining and dancing on the entire second floor. *Id.* at 470, 153 *A.*2d 723. The zoning board's resolution approved the variance based solely on the observation that it would "serve a worthy public use in the community by affording a meeting place for numerous local civic organizations and furnish[ing] the facilities for desirable social activities such as weddings, testimonials and special gatherings." *Id.* at 476, 153 *A.*2d 723. The appellate court overturned that grant of relief, concluding that there was no evidence in the record to support it. *Ibid.* In that context, the panel commented that there was "no supporting evidence that it is essential that those specific facilities be available at that particular site[,]" *ibid.,* and that there were "no facts demonstrating that it is necessary that this particular building in a residential zone be rendered available for the purposes outlined[,]" *id.* at 478, 153 *A.*2d 723.

A decade later, this Court relied on the *Mocco* opinion in similar circumstances, addressing a board's grant of a variance to expand a milk processing plant located in a residential district, which was an existing nonconforming use. *Kohl, supra,* 50 *N.J.* at 270–71, 234 *A.*2d 385. As in *Mocco,* the board's resolution contained no specific findings of special reasons, relying instead on the general importance of an adequate milk supply for the community as the basis for granting the variance. *Id.* at 274, 234 *A.*2d 385. Once again, it was the absence of proofs that motivated this Court to conclude that the board's decision could not be sustained. *Id.* at 283, 234 *A.*2d 385. It was in that context that we observed that there was "no showing that the promotion of the general welfare could be accomplished only by an expansion of [the milk processing plant] at its present location." *Id.* at 280, 234 *A.*2d 385.

Finally, in *Fobe,* this Court addressed the denial of a use variance application to build garden apartments in a residential zone. 74 *N.J.* at 523, 379 *A.*2d 31. As part of the analysis, the Court, quoting *Mocco,* observed that in order to grant a use variance based on particular suitability, "it must be shown and

found that 'the particular site ... *must* be the location for the variance' sought in order to promote the general welfare." *Id.* at 534, 379 *A.*2d 31 (quoting *Mocco, supra,* 56 *N.J.Super.* at 477, 153 *A.*2d 723). That language was used in observing that there was neither proof in the record nor a determination by the board that "unless the plaintiff's project is erected at the particular site for which the variance is sought the general welfare inherent in provision of more multi-family housing will not be attained." *Id.* at 534–35, 379 *A.*2d 31. Although that statement might appear to be a broadly applicable pronouncement, it was not the Court's holding. Rather, this Court affirmed the denial of the variance in that case because the applicant's proofs failed to satisfy the negative criteria. *Id.* at 537–38, 379 *A.*2d 31. Thus, the Court concluded that even if the proposed use satisfied the positive criteria because it was particularly suitable and, therefore, beneficial for the general welfare, the zoning board's decision to deny the variance would be upheld because the negative criteria were not met. *Ibid.*

When considered in context, therefore, the holdings of this Court in *Kohl* and *Fobe* and of the Appellate Division in *Mocco* did not equate particularly suitable with uniquely suited nor did they demand that there be no other alternative site. Instead, each turned on an evaluation of the sufficiency of the factual record and the adequacy of the explanation of reasons given by the board in its resolution as the support for its decision. Indeed, when stating the test that applies to the evaluation of particular suitability, the standard that was utilized was the one this Court articulated: "there must be a finding that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought." *Kohl, supra,* 50 *N.J.* at 279, 234 *A.*2d 385 (citing *Mocco, supra,* 56 *N.J.Super.* at 477, 153 *A.*2d 723).

▮▮▮ Our use of the words peculiar and particular makes clear that the inquiry concerning whether a proposed use variance should be granted on this basis is an inherently fact-specific and site-sensitive one. Although the availability of alternative loca-

tions is relevant to the analysis, demonstrating that a property is particularly suitable for a use does not require proof that there is no other potential location for the use nor does it demand evidence that the project "must" be built in a particular location. Rather, it is an inquiry into whether the property is particularly suited for the proposed purpose, in the sense that it is especially well-suited for the use, in spite of the fact that the use is not permitted in the zone. Most often, whether a proposal meets that test will depend on the adequacy of the record compiled before the zoning board and the sufficiency of the board's explanation of the reasons on which its decision to grant or deny the application for a use variance is based.

The trial court interpreted the particularly suitable standard to demand proof that the property is uniquely suited or solely suited for the otherwise impermissible use. Although there are phrases in decisions of the Appellate Division and of this Court that employed language that would so suggest, we have not understood the MLUL to adopt so stringent a criterion. Instead, in our review of this matter, we conclude that the appellate panel appropriately understood and applied the site-specific standard that we have utilized to determine particular suitability. In applying that standard to the factual record compiled before the Zoning Board and in considering the great detail included in the Board's explanation of the reasons why this property is particularly suited to the proposed use, we conclude that Himeji amply met its burden of demonstrating this special reason for the use variance it requested.

## IV.

The second issue presented in this appeal requires us to determine whether the Appellate Division erred when it decided the additional challenges plaintiff had raised in his complaint in the action in lieu of prerogative writs rather than remanding them to the Law Division for further proceedings. Our consideration of this aspect of the appeal requires us to evaluate the panel's

implicit decision to exercise its original jurisdiction, as well as the sufficiency of the record on which it conducted that review and the adequacy of the manner in which it did so.

### A.

Appellate courts are empowered to exercise original jurisdiction within the bounds set forth in our rules. Accordingly, an "appellate court may exercise such original jurisdiction as is necessary to the complete determination of any matter on review." *R.* 2:10–5. We have observed that the exercise of original jurisdiction is appropriate when there is "public interest in an expeditious disposition of the significant issues raised[.]" *Karins v. City of Atlantic City,* 152 *N.J.* 532, 540–41, 706 *A.*2d 706 (1998).

More recently, we have explained that *Rule* 2:10–5 "allow[s an] appellate court to exercise original jurisdiction to eliminate unnecessary further litigation, but discourage[s] its use if factfinding is involved." *State v. Santos,* 210 *N.J.* 129, 142, 42 *A.*3d 141 (2012). Similarly, our Appellate Division has observed that a court's

[r]esort to original jurisdiction is particularly appropriate to avoid unnecessary further litigation, as where the record is adequate to terminate the dispute and no further fact-finding or administrative expertise or discretion is involved, and thus a remand would be pointless because the issue to be decided is one of law and implicates the public interest.

[*Vas, supra,* 418 *N.J.Super.* at 523–24, 14 *A.*3d 766 (internal citations omitted).]

Of particular relevance to this appeal, we have exercised original jurisdiction in the context of an appeal from the decision of a municipal planning board that was erroneously overturned by the trial court. *Bressman v. Gash,* 131 *N.J.* 517, 528–29, 621 *A.*2d 476 (1993). We explained that "[n]o useful purpose would be served by remanding the matter to the lower courts for their review of the record, which would be subject to review by this Court." *Id.* at 529, 621 *A.*2d 476; *see Pieretti v. Town of Bloomfield,* 35 *N.J.* 382, 385, 173 *A.*2d 296 (1961) (electing to bring land use matter to close through review of record provided rather than through remand).

In determining whether to exercise original jurisdiction, an appellate court not only must weigh considerations of efficiency and the public interest that militate in favor of bringing a dispute to a conclusion, but also must evaluate whether the record is adequate to permit the court to conduct its review. That is so because in exercising original jurisdiction, we apply the same standard and scope of review as would the decision-maker into whose place we step.

In the context of this land use dispute, the role of the court is to evaluate whether the Zoning Board's decision "is founded on adequate evidence[,]" *Burbridge, supra,* 117 *N.J.* at 385, 568 *A.*2d 527, and, as we have held, "the record made before the Board is the record upon which the correctness of the Board's action must be determined[,]" *Kramer, supra,* 45 *N.J.* at 289, 212 *A.*2d 153. In conducting that review, we accord deference to the decision of the Zoning Board, and "[we] reverse only if we find its decision to be arbitrary, capricious, or unreasonable." *Bressman, supra,* 131 *N.J.* at 529, 621 *A.*2d 476. "Even when doubt is entertained as to the wisdom of the action, or as to some part of it, there can be no judicial declaration of invalidity in the absence of clear abuse of discretion by the public agencies involved." *Kramer, supra,* 45 *N.J.* at 296, 212 *A.*2d 153.

Applying these principles, the Appellate Division's election to exercise its original jurisdiction was entirely appropriate. The record on which its decision was required to be made was both complete and thorough and the resolution of the Zoning Board specifically addressed the reasons for that body's decision to grant all of the variances that plaintiff challenged in the complaint.

Even were we to conclude that the appellate panel fell short in its performance of that task, there is no impediment to our election to conduct the thorough and searching review of the record in light of the arguments raised by plaintiff that he contends has heretofore been lacking. Nor is there any reason to delay the resolution of this dispute through a remand to either the Appellate Division, for a more detailed explanation of the reasons

for its affirmance of the Zoning Board's decision, or to the trial court for a review in the first instance. Our review, like that of the trial and appellate courts, is a de novo review on the record. In the interests of efficiency and finality, we elect to conduct that review.

### B.

The arguments that plaintiff asserts are entitled to be reviewed include both general challenges to the adequacy of the Board's evaluation of the positive and negative criteria in connection with all of the variances it granted and specific challenges to the Zoning Board's decision to grant Himeji's application for variances relating to density, *N.J.S.A.* 40:55D–70(d)(5), height, *N.J.S.A.* 40:55D–70(d)(6), and bulk, *N.J.S.A.* 40:55D–70(c)(2), as well as its decision to grant a waiver relating to the parking requirements.[5]

We begin with a recitation of the governing principles. Applications to a zoning board for variances relating to density, *N.J.S.A.* 40:55D–70(d)(5), and height, *N.J.S.A.* 40:55D–70(d)(6), are subject generally to the same weighing analysis that applies to other (d) variances. However, as the Appellate Division has concluded in a related context, if variances of this type are requested in connection with a permitted use, a lower threshold equivalent to the standard applicable to conditional use variances is appropriate. *See Randolph Town Ctr. Assocs. v. Twp. of Randolph*, 324 *N.J.Super.* 412, 416–17, 735 *A.*2d 1166 (App.Div.1999) (relying on *Coventry Square, supra*, 138 *N.J.* at 297–99, 650 *A.*2d 340).

Similarly, when a zoning board considers an application for a (d)(1) use variance, it tests the associated requests for density and height variances against a more relaxed standard. That means that the applicant is required to demonstrate, to the

---

5 Although the challenges raised in plaintiff's petition are not coextensive with the issues raised in his complaint, in light of our election to exercise our original jurisdiction, we deem it appropriate to address all of the issues that were raised in the complaint.

board's satisfaction, "that the site will accommodate the problems associated with a proposed use with [a greater density] than permitted by the ordinance." *Grubbs v. Slothower,* 389 *N.J.Super.* 377, 389, 913 *A.2d* 137 (App.Div.2007) (alteration in original) (quoting *Randolph, supra,* 324 *N.J.Super.* at 417, 735 *A.2d* 1166).

Applications for (c)(2) variances, also referred to as bulk variances, are considered in accordance with a more flexible test that balances "the extent of the non-conformity proposed and the degree of negative impact to the neighborhood of the subject property ... [against] the effect of the deviation relative to the purposes for land use controls listed in [the MLUL]." 36 *New Jersey Practice, Land Use Law* § 15.12, at 373 (David J. Frizell) (3d ed.2005). As we have observed, "[t]he Legislature undoubtedly intended through the c(2) variance to vest a larger measure of discretion in local boards in a limited area of cases." *Kaufmann v. Planning Bd.,* 110 *N.J.* 551, 566, 542 *A.2d* 457 (1988). As a result, "[t]he [MLUL] contemplates that even absent proof of 'hardship' pursuant to subsection c(1), a bulk or dimensional variance that advances the purposes of the MLUL can be granted if the benefits of the deviation outweigh any detriment." *Lang v. Zoning Bd. of Adjustment,* 160 *N.J.* 41, 57, 733 *A.2d* 464 (1999).

In plaintiff's complaint, four of the arguments related to the grant of the (d)(1) use variance, which plaintiff attacked based on an asserted failure of the applicant to demonstrate particular suitability, to offer enhanced quality of proofs, and to meet either of the negative criteria. The other arguments raised[6] in the complaint focused on the associated (d) and (c)(2) variances. As to the remaining (d) variances, plaintiff simply asserted that there were no adequate special reasons given for any of them. Regard-

---

[6] Although plaintiff included a count in the complaint attacking the resolution for granting a variance relating to FAR, *N.J.S.A.* 40:55D–70(d)(4), and although on appeal Himeji contended that the record would sustain such a request, no such relief was sought or granted.

ing the (c)(2) variances and the parking waiver, plaintiff generally contended that the applicable standards had not been met.

We begin, then, with the attack on the adequacy of the proofs that supported the (d)(1) use variance other than the evidence of particular suitability, which we have already addressed. Plaintiff challenges the adequacy of the proofs, charging that Himeji failed to meet the applicable enhanced proof standard. As we have held, in addition to demonstrating a special reason, in this case, particular suitability, an applicant for a use variance must offer "an enhanced quality of proof" that the variance will not be inconsistent with the intent and the purpose of the master plan and the zoning ordinance. *Medici, supra,* 107 *N.J.* at 4, 526 *A.*2d 109. The purpose of this enhanced standard is "[t]o assure that the board of adjustment does not usurp the governing body's statutory authority to determine the municipality's zoning," *Saddle Brook, supra,* 388 *N.J.Super.* at 79, 906 *A.*2d 454, and we have required the board to make "clear and specific findings" that this showing has been made, *Medici, supra,* 107 *N.J.* at 4, 21, 526 *A.*2d 109. As we have explained, "[t]he applicant's proofs and the board's findings ... must reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district." *Id.* at 21, 526 *A.*2d 109.

In its discussion of the negative criteria, the Zoning Board's resolution included a clear recognition of the implications of the project for the public good and of the demands of the Master Plan and the zoning ordinance. It also identified the reasons why the Board concluded that the applicant had proven, by the enhanced quality of proofs, that the proposed use satisfies the negative criteria. The property's location, at the edge of the R zone and close to mass transit; the unique configuration of the parcel due to the amalgamation of four contiguous through lots with frontage on two major roadways; the use of a design that will reduce traffic congestion by diverting traffic to one of the roads; its ample provision of off-street parking; and its fulfillment of the goal of providing much-needed housing all serve to demonstrate

that the project satisfies the negative criteria. We reject, therefore, plaintiff's attack on the resolution for its asserted failure to apply the enhanced quality of proofs standard and for its asserted failure to demonstrate compliance with the negative criteria as being without merit.

Plaintiff's complaint also challenged the decision of the Zoning Board to grant the other requested (d) variances that permitted the project to be built in spite of its lack of compliance with the zoning limitations for height and density. The essential thrust of plaintiff's challenges to each of the (d) variances that the Zoning Board granted is that each required a separate analysis of the special reasons prong of the proofs under the MLUL.

The Zoning Board, as part of its resolution, disagreed with plaintiff's view of the way in which the MLUL operates as to the required proofs. Although citing an unpublished Appellate Division decision [7] as its source, the Board correctly identified the standard by which related (d) variances for height and density are evaluated when the Board is considering them in conjunction with an application for a use variance. *See Randolph, supra,* 324 *N.J.Super.* at 417, 735 *A.2d* 1166 (holding that appropriate test, derived from *Coventry Square,* is whether "the site will accommodate the problems associated with [the] proposed use with [a greater density] than permitted by the ordinance"); *accord Grubbs, supra,* 389 *N.J.Super.* at 389, 913 *A.2d* 137. Using that standard, the Board conducted a thorough, individualized analysis of the application as it related to height and density.

 There is little doubt about the fact that a use variance, by its nature, carries with it the implication that the ordinary bulk and density requirements of the zone will not be applied. Indeed, we observed long ago that, in reviewing a use variance, "it is

---

[7] The Board relied on the unpublished Appellate Division opinion to the effect that (d) variances would also be subsumed within the (d)(1) variance because the opinion involved plaintiff and the same zoning board. We do not consider the unpublished opinion in our analysis. *See R.* 1:36–3.

obvious that the height and front yard restrictions are intended to apply to single-family residences" which was the only permitted use in the zone, rather than to the proposed use. *Kramer, supra,* 45 *N.J.* at 295, 212 *A.*2d 153. That does not mean that a zoning board can ignore the ordinarily applicable limits on height, for example, when evaluating an application for a use variance. It does mean that the board can, as part of granting a use variance, consider the other requested variances as ancillary to the principal relief being sought.

Indeed, this Board treated the application in just such a fashion. As part of the analysis of the use variance, the Board did not focus simply on the use, but on the overall project design, including its height and density. Although both were inconsistent with the ordinarily applicable limitations in the zone, the Board addressed each as part of deciding to grant the use variance. Nor did the Board simply authorize the height and density that Himeji requested. On the contrary, the Board required that the building be lowered in height and reduced in regard to the number of living units, thus limiting the extent to which the project varied from the zone and bringing it into conformity with nearby existing buildings to retain consistency with the overall zone plan.

Plaintiff would have us instead require that the Board demand that the applicant demonstrate separate special reasons for the proposed height and density as a prerequisite to being granted those additional variances. Our analysis of the meaning and intent of the MLUL is that no such particularized showing is required, especially in light of the record before this Court of the way in which the Board in fact addressed the implications of the additional variance requests. It would make little sense to expect that the Zoning Board, faced with a request for a use variance that would result in a high-rise apartment building, would also demand that the applicant separately demonstrate that it should be higher than what is permitted in the zone for single-family dwellings. Rather, the role of a zoning board, as part of its evaluation of the application for the use variance, is to consider the

height and density requested in that context. Accordingly, here, the Board was entitled to, and it did, demand of the applicant that the proposed height be lowered and the number of units be fewer to reduce the non-conformity to a level the Board found to be appropriate.

Our consideration of the challenge in the complaint to the Board's determination to grant the variances for setbacks and coverage, see N.J.S.A. 40:55D–70(c)(2), and to grant the waiver relating to parking spaces, need only be brief. It is in this context that the Zoning Board referred to guidance from the Appellate Division concerning the way in which (c)(2) variances are evaluated when they are requested as part of an application for a (d)(1) use variance. As noted by the Zoning Board, the Appellate Division has observed that "[a] Zoning Board, in considering a 'use' variance, must then consider the overall site design[,]" with the result that, "the 'c' variances are subsumed in the 'd' variance." Puleio, supra, 375 N.J.Super. at 621, 868 A.2d 1114.

Although the Board referred to the (c)(2) variances as being subsumed in the consideration of the (d) variances, the record of the Board's review of the building's overall design amply supports its decision. More to the point, the record supports and the resolution demonstrates that the requested (c)(2) variances both advance the purposes of the MLUL and create benefits that outweigh any detriment caused by deviating from the zoning ordinance. See Lang, supra, 160 N.J. at 57, 733 A.2d 464.

Finally, we find no ground on which to overturn the Board's conclusion that the project's proposed on-site parking was sufficient to meet the needs of the building. In particular, as the resolution explained, the Board's evaluation of the sufficiency of the proposed number of parking spaces was tied both to the reduced number of units in the redesigned building and to the availability of public transportation nearby.

Our review of the reasons given in the Board's resolution for its decision to grant each of the requested variances and the parking waiver, in light of the record compiled by the applicant, makes

302

plain that the Board discharged its duty carefully and completely, and we find no basis on which to conclude that any aspect of its decision was arbitrary, capricious or unreasonable.

## V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge CUFF (temporarily assigned)—6.

Judge RODRÍGUEZ (temporarily assigned) did not participate.