**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5476-16T3

MICHAEL W. VALENTINE,

     Plaintiff-Appellant,

v.

SOMERS POINT PLANNING
BOARD and 924 BAY AVENUE,
LLC,

     Defendants-Respondents.

_____

Submitted October 3, 2018 – Decided July 9, 2019

Before Judges Fuentes, Vernoia and Moynihan

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-1979-16.

Carl N. Tripician, attorney for appellant.

Fleishman Daniels Law Offices LLC, attorneys for respondent Somers Point Planning Board (Joel Marc Fleishman, on the brief).

Fox Rothschild LLP, attorneys for respondent 924 Bay Avenue, LLC (Jack Plackter and Bridget A. Sykes, on the brief).

PER CURIAM

Defendant 924 Bay Avenue, L.L.C., filed a Preliminary and Final Major Site Plan application before the Planning Board of the City of Somers Point (Board) to construct a 6000 square-foot restaurant and banquet hall, with a waterfront bar and marina. The proposed restaurant required the Board to grant eight separate bulk variances and approve an off-site parking plan pursuant to City ordinance Sec. 250-61.3. The Board heard testimony on the application in public hearings conducted over two non-sequential days. In addition to the applicant's witnesses, the Board heard from area residents who live near the location of the proposed restaurant. These residents objected to the scale of the project and expressed particular concern about how it would exacerbate the scarcity of on-street parking.

In response to the concerns raised by the objectors, the applicant reduced the seating capacity of the restaurant from 370 to 281 seats, by redesigning the internal configuration of the structure without altering its architectural footprint. The applicant also agreed to cease the operation of its banquet hall if it was unable to provide an off-site parking facility in accordance with Sec. 250-61.3. On a vote of six members in favor, one against, and one recusal, the Board approved the application and granted the required variances pursuant to N.J.S.A.

A-5476-16T3

40:55D-70(c)(1) and (2), of the Municipal Land Use Law and City ordinance Sec. 250-61.3.

Plaintiff Michael W. Valentine thereafter filed this action in lieu of prerogative writs in the Law Division pursuant to Rule 4:69-6(b)(3), in which he challenged the decision of the Board as arbitrary, capricious, and untethered to the requirements of N.J.S.A. 40:55D-70(c)(1) and (2), and in violation of the requirements of City ordinance Sec. 250-61.3. After reviewing the record developed before by the parties, the trial court did not find any legal grounds to disturb the Board's decision. In his appeal to this court, plaintiff argues the Law Division erred when it upheld the Board's decision to: (1) grant the applicant front-yard, setback, and lot coverage variances; and (2) approve the off-site parking arrangement.

We agree that the off-site parking arrangement the Board approved does not comply with the requirements of City ordinance Sec. 250-61.3 and reverse. The following facts will inform our legal analysis.

I

The Board first met to consider the applicant's presentation on February 17, 2016. Prior to this hearing, Robert Watkins, P.E., the Board's Planning

Engineer, submitted a memorandum dated April 29, 2015, which provided the following description of the proposed project:

> The applicant is requesting Preliminary Major Site Plan approval to construct a 6,000 square foot restaurant with 390 seats located within the building and 156 seats located on an outside deck area on Block 1810; Lot 8 for a total of 546 seats. The existing site was the location of "Dolphin Dock" marina which has since been demolished. The applicant proposes to have an elevated building with parking proposed under the building and on the south side of the restaurant with 42 parking spaces. There is a 4,000 square foot deck which overlooks the bay and a new bulkhead is proposed with public access to the water's edge. The applicant proposes [a] 21 slip marina area for patrons to use the restaurant, these slips[1] will not be rent. There will be a ten (10) foot wide wooden deck harbor walk provided between the deck and the bulkhead.

Watkins also noted that the property is located in the Historic Village Waterfront Zoning District, which permits restaurants with outdoor seating. However, the proposed project did not comply with the City's zoning requirements. The applicant thus sought approval for the following eight variances:

---

[1] In his testimony before the Board, the applicant's project architect Richard Cobatta defined the term "slip" as "essentially parking spaces for boats." He also assured the Board that the applicant did not intend to rent the slips. The slips would only be used "to allow people to come there that want to frequent the restaurant."

1) Max. Lot Coverage Allowed:     30%     Applicant sought 80%

2) Min. Front Setback Required:     50 ft.     Applicant provided -0- ft.

3) Min. Rear Setback Required:     30 ft.     Applicant provided 29 ft.

4) Max. Building Height Allowed:     35 ft.     Applicant provided 36 ft.

5) Loading Area Required:     14/30 ft.     Applicant provided -0- ft.

6) Parking Buffer Required:     10 ft.     Applicant provided -0- ft.

7) Min. Parking Spaces Required:     182     Applicant provided 42 spaces

8) Parking Setback Required:     15 ft.     Applicant provided 5 ft.

The lack of sufficient onsite parking and the method the applicant proposed to address it was the most contentious part of the application. Board members and area residents expressed strong reservations about the practicality of the off-site parking arrangement the applicant proposed, as well as its legal viability from the point of view of its enforcement. The applicant's architect testified that he anticipated the off-site parking arrangement "would work" consistently with the applicant's business model. Relying on "Google to get an understanding" of how long it would take to drive from the off-site parking lot to the restaurant, the architect estimated it would take a person eight minutes to walk from the lot to the restaurant.

A-5476-16T3

Based on this estimated walking-time, once the forty-one on-site parking spaces are occupied, the applicant planned "to have a small sign on the site itself, like a traffic type of sign that will point you to the address of the other parking facility." The applicant intended to provide valet service only when the banquet facility was open. In light of this arrangement, the applicant's architect opined "that this is not a variance for a deficiency in parking. It's a variance for a deficiency in convenient parking to make it work for our needs." (Emphasis added). The architect expounded on this characterization of the parking requirement issue as follows:

> We do have the parking available to make sure that Mr. Mitchell has a successful business. He had to go out and do that because he recognizes the importance of this. So, it's a variance. While on its face when you look at this piece of paper, it looks like a big variance that we're asking for, but operationally, Mr. Mitchell has a plan in place. Will he continue to look for a better, more convenient solutions? My guess is he probably will. He has a plan in place to make this a very successful project. That is the nuts and bolts of how he intends to meet the needs of this project as far as parking concerns.

This explanation by the architect eliminates any doubt a reasonable observer would have that the approach presented was intended to be an applicant-centered solution. The applicant did not address or consider how this proposal would affect the availability of on-street parking in the area.

6

The record reflects that on-street parking remained a significant concern for a number of area residents and members of the Board. The Board's Acting Chair was dubious about the effectiveness of valet parking as a means of preventing restaurant customers from parking on the street: "Bottom line is . . . you say during the banquet times you're going to have valet, but at all other times, you're going to have a sign saying parking is up the street. What's going to stop these people from just parking in the neighborhoods?" The Board's Planning Engineer expressed similar concerns about the efficacy of granting a variance conditioned on the availability of valet parking:

> [I]f the Planning Board grants a variance for this off-site parking requirement that's a block and a half away, the only mandatory thing to make them park there is somehow mandatory valet parking from this property to that property and that none of their patrons will park on the street. I don't know how you can enforce that.

The Board adjourned to allow the applicant to address these and other concerns raised by members of the Board and area residents. In a follow-up memorandum dated April 20, 2016, the Board's Planning Engineer described how the applicant proposed to address the parking issue:

> The applicant is proposing to have a total of 281 seats for the restaurant. There are 92 seats proposed inside the restaurant area and 15 seats around the bar. There are 32 seats proposed on the outside deck area and . . . 22 seats proposed on the outside bar. There are 120

7

seats proposed in a banquet room on the second floor of the building. The 281 seats restaurant/banquet room requires 124 parking spaces and the applicant is only proposing 41 parking spaces on site. The applicant has provided a variance justification and has provided a lease agreement for 83 parking spaces that can be used at [a location on] Shore Road.

. . . .

The applicant shall provide testimony on the lease agreement and how the cars will be parked on the vacant lot. A survey of the property shall be provided to ensure there are 53 parking spaces and if such parking spaces are not available the applicant shall request a parking variance for not meeting such parking.

The Planning Engineer also recommended that the Board's attorney[2] review the applicant's proposed lease agreement "for [requirements] that may be imposed by the Board as a condition of approval."

On June 15, 2016, the Board reconvened to consider the applicant's modifications. The applicant's attorney called Jon Barnhart, a licensed professional planner and certified municipal engineer, to explain how the application, as modified, exceeded the parking requirements. In response to

---

[2] In the southern part of our State, it is customary to refer to attorneys who represent municipal zoning boards and other similar public entities as "solicitors." In the interest of clarity, we will refer to the Board's lawyer as "the Board's attorney."

counsel's question, Barnhart assured the Board "that whenever the banquet room is open, there would be exclusively valet parking only for banquet."  Barnhart further testified that when, considering the on-site and off-site parking spaces together, as provided by Section 250-61.3 of the Ordinance of the City of Somers Point, the project "meet[s] and/or exceed[s] the parking requirement."

The record before us contains a copy of a lease agreement dated November 5, 2015, "entered into between Mac's Shore Development, LLC (Lessor) and 924 Ginger's on the Bay, LLC (Lessee)," through which the applicant leased a vacant lot located at 861 Shore Road in Somers Point.  This one-page agreement contains a total of nine numbered paragraphs, which we recite verbatim:

> 1. The Lessor [sic] shall use the aforementioned land as a parking lot for customers patronizing the restaurant known as '924 Ginger's on the Bay' to be located at _____ and for no other purpose.
>
> 2. The term of the Lease shall begin on January 1, 2016. The lease shall be in perpetuity but may end with Lessee providing 120 day notice to the other party. Term will be no less than twelve (12) months.  Lessor may end lease with 120 day notice to Lessee for sale of property only.
>
> 3. Lessee shall pay total amount of _____ month payable on the date of the lease commencement and payable on that same day of every month.
>
> MAKE RENT CHECKS PAYABLE TO: ___

MAIL RENT CHECKS TO: ___

4. Lessee shall not allow or commit any waste of the premises, nor make any unlawful, improper or offensive use of same.

5. Lessee may assign or sublet the property to provide parking spaces for with prior approval of the property owner, Mac's Shore Development, LLC.

6. Lessee shall permit Lessor and/or Rental Agent, their agents, and employees upon request, to inspect the property for any reasonable purpose connected with the repair, improvements, care and management of the property.

7. Lessee shall clean the property of any debris and work with the municipality of Somers Point to comply with any township[3] rules and regulations and to improve the appearance of the property in general. Any improvements require express written consent of the Lessor. Lessee will ensure the property is clear of debris on or before October 15, 2015. In the event the Lessor cancels the lease prior to October 15, 2015, Lessor shall reimburse Lessee for any expenditures related to cleaning property.

8. Lessee shall maintain a liability insurance policy on the property with Mac's Shore Development as the loss payee. Minimum coverage shall be no less than $1,000,000.

9. Lessee shall pay two (2) months security deposit to be held in escrow.

---

[3] We take judicial notice that Somers Point's municipal government is organized as a City, not a Township. N.J.R.E. 201(a).

A-5476-16T3

The lease was signed on February 17, 2016, by individuals purporting to represent the corporate entities Mac's Shore Development, LLC, as lessor and 924 Ginger's on the Bay, LLC, as lessee. Plaintiff claims the aerial photograph the applicant provided as an exhibit to the Board shows the leased lot is located three and one half blocks from the restaurant. A number of objectors also testified that the lot is listed for sale.

At the conclusion of the June 15, 2016 hearing, the Board's Planning Engineer Richard Watkins reviewed the variances required by the application. On the off-site parking issue, Watkins stated: "There's no parking variance as such due to the lease agreement that's been submitted." The Board's attorney also addressed the Board on the question of how to consider the off-site parking issue:

> BOARD ATTORNEY: [T]he Board has to determine whether the long-term lease satisfies the ordinance. I would say that the long-term lease should be filed with the board secretary immediately if approval is granted. There was a one-year lease presented, there was a 120 day notice of cancellation that the applicant -- if that occurs, the applicant must report to the board secretary and cease use once it expires on the lease until board approval until they appear to comply with the parking or seek a variance. And that goes with losing it in any way, not just the 120 day notice, with any type of notice. The off-site parking area shall comply with the requirements of section 250-61.3. I went through that, but just to reiterate that for the record.

A-5476-16T3

WATKINS: One comment, in regards to putting that lease together and making sure that somebody is looking at it, it may be beneficial to put something in there that they can't get their mercantile license renewed without having that lease agreement with it, that way you can always check to make sure it's there. . . . . That's the only way to look at it every year and make sure it's there.

. . . .

BOARD ATTORNEY: I have it as a condition. We talked about section 250.61.3 and it's concerning off-site parking and they comply with that provision. That talks about that it has to be under a long-term lease, which I stated earlier. It has to be for the exclusive use of the owner/applicant and the spaces have to be clearly marked and designated as being available only for use by patrons of the business. They'll certify annually that such spaces remain available for such use and that goes along with the lease, I should say that. And there's requirements and penalties if they don't comply with what we spoke about. All employees shall use the off-site parking area. The applicant shall utilize valet parking at any time the banquet facility is operating in lieu of a loading zone and this is a variance, but I will put it as a condition, they shall not use the loading zone in lieu of that, they shall not load and unload during business hours. All those conditions on Mr. Watkins's report, filing of amended plans with the board showing all modifications made at the prior meeting and tonight's meeting including the deck area and removal of the decking.

WATKINS: That's all the conditions that I have at this point.

The Board adopted the resolution approving the Preliminary and Final Major Site Plan application on July 20, 2016. Paragraphs 4, 5, and 6 addressed the off-site parking requirement pursuant to City ordinance Sec. 250-61.3.

> 4) The proposed lease for off-site parking shall be filed with the board secretary and shall be for a minimum of one year. At the time of any notice to cease use of or the termination of the lease from the owner of the parking lot, applicant shall report such to the board secretary immediately and cease the use of the proposed second floor banquet area once the lease terminates until this board hears an application as to the parking requirements necessary under the ordinance. Upon the termination of the off-site parking lease, the applicant shall also, if necessary, eliminate the amount of seats necessary to comply with the ordinance. The applicant shall further obtain a mercantile license with the clerk's office and provide a copy of the lease to the clerk and follow such other requirements of the ordinance. The off-site parking area shall comply with all the requirements of the ordinances including but not limited to the requirements of Sec. 250.61.3.
>
> 5) All employees of the business shall use the off-site parking area.
>
> 6) The operators or owners of the restaurant shall provide mandatory valet parking at any time the banquet facility is being utilized.
>
> [(Emphasis added).]

A-5476-16T3

Plaintiff filed this action in lieu of prerogative writs before the Law Division pursuant to Rule 4:69-6(b)(3), challenging the Board's decision on two legal grounds. First, plaintiff argued the Board failed to properly apply the standard codified in N.J.S.A. 40:55D-70(c)(1) and (2) for granting variances from the municipality's zoning requirements. Second, plaintiff argued the Board misapplied and abused its discretionary authority pursuant to Somers Point Ordinance Section 250-61.3 by permitting the applicant to satisfy its on-site parking requirements by entering into a lease that could be terminated merely by the landlord providing only 120-day notice. After ostensibly conducting a de novo review of the Board's interpretation of Section 250-61.3, the Law Division deferred "to the Board's knowledge of local conditions" and upheld the Board's decision.

In this appeal, plaintiff argues the Law Division erred when it upheld the Board's approval of the front yard setback variance, and ignored the plain language of Section 250-61.3 to find the applicant's lease for off-site parking satisfied the requirements of the ordinance. The Board and the applicant both urge us to affirm the Law Division's decision. We are satisfied the Law Division erred as a matter of law when it found the lease agreement the applicant entered

into met the project's parking requirement as a "long-term lease" under Section 250-61.3. Parking is a material factor in determining the project's suitability to this area of the City. The applicant's failure to strictly adhere to the requirements of Section 250-61.3 established sufficient grounds for the Board to deny the Preliminary and Final Major Site Plan application as a matter of law.

We begin our analysis by describing the relevant standard of review. Ordinarily, we review a decision made by municipal zoning boards with great deference because of "their peculiar knowledge of local conditions." Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of Franklin, 233 N.J. 546, 558 (2018) (quoting Price v. Himeji, LLC, 214 N.J. 263, 284 (2013)). "On the other hand, . . . a board's decision regarding a question of law . . . is subject to a de novo review by the courts, and is entitled to no deference since a zoning board has 'no peculiar skill superior to the courts' regarding purely legal matters." Id. at 559 (quoting Chicalese v. Monroe Twp. Planning Bd., 334 N.J. Super. 413, 419 (Law Div. 2000)).

We thus review the requirements imposed by Section 250-61.3 de novo, "unconstrained by deference" to the decisions reached by the Board or the Law Division Judge. State v. Grate, 220 N.J. 317, 329 (2015). A municipal ordinance is a piece of legislation subject to judicial interpretation guided by the

same well-established rules of statutory construction applicable to any other type of legislative enactment. Our goal is to give effect to the legislative body's intent as evidenced by the language of the ordinance. The best indicator of the legislative intent is the ordinance's plain language. DiProspero v. Penn, 183 N.J. 477, 492 (2005).

The ordinance's plain language must be construed "in context with related provisions so as to give sense to the legislation as a whole." Spade v. Select Comfort Corp., 232 N.J. 504, 515 (2018) (quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 570 (2017)). Stated differently,"[u]nless it is 'inconsistent with the manifest intent of the legislature,' or 'another or different meaning is expressly indicated,' we ascribe to the Legislature's words and phrases 'their generally accepted meaning, according to the approved usage of the language.'" Finkelman v. Nat'l Football League, 236 N.J. 280, 289 (2019) (quoting N.J.S.A. 1:1-1).

Section §250-61.3 provides:

> Notwithstanding anything to the contrary contained in § 250-61.2, in the sole discretion of the Somers Point Planning Board or Somers Point Board of Adjustment, as the case may be, an applicant/owner of a property or business may include off-site parking spaces located in a private owned lot or parking garage only if such spaces are under long-term lease to the owner/applicant for the exclusive use of said owner/applicant and such

spaces are clearly marked and designated as being available only for use by patrons of such business or property; an owner/applicant shall continue to certify annually that such spaces remain available for such exclusive use.

A plain reading of the ordinance's prefatory language gives the Board "sole discretion" to permit an applicant to satisfy a project's on-site parking requirement by including "off-site parking spaces located in a private owned lot or parking garage[.]" Pursuant to Section 114.51, restaurants are required to provide "one onsite off-street parking space for each three seats devoted to service." Here, the applicant sought Board approval for a restaurant with a seating capacity of 182, while providing only 42 onsite off-street parking spaces. Under the 3/1 ratio codified under Section 114.51, the restaurant is required to provide 61 on-site off-street parking spaces. In lieu of treating this shortfall as a variance subject to the standards of N.J.S.A. 40:55D-70(c)(1) and (2), the Board opted to exercise its discretion under Section 250-61.3 and allowed the applicant to cure this deficiency by securing additional off-site parking spaces "located in a private owned lot or parking garage."

However, to accomplish this under Section 250-61.3, the off-site parking spaces must be "under long-term lease to the owner/applicant for the exclusive use of said owner/applicant and such spaces are clearly marked and designated

17

as being available only for use by patrons of such business or property."
(Emphasis added).  The ordinance does not define "long-term lease."  The record developed before the Board is devoid of any data to guide the Board on how this term has been used or construed in the context of other similar applications.  The applicant did not present the testimony of a local real estate broker or agent to provide the Board with empirical data of the length of the terms of commercial leases in general, and if available, of parking lot leases in particular.

In this light, we are left to construe the term "long-term lease" by applying our collective common sense and experience as jurists.  In our judgment, no reasonable person can construe the lease entered into by the applicant here as a "long-term lease."  Paragraph 2 of this one-page lease provides:

> The term of the Lease shall begin on January 1, 2016.
> The lease shall be in perpetuity but may end with Lessee providing 120 day notice to the other party. Term will be no less than twelve (12) months.  Lessor may end lease with 120 day notice to Lessee for sale of property only.  (Emphasis added).

A plain reading of this language shows the actual guaranteed term of the lease is four months.  Either party has the express authority to terminate the lease by merely providing 120-day prior notice.  The applicant-lessee may serve the landlord with the notice to terminate at any time.  The landlord may terminate the lease "with 120 day notice to Lessee for sale of property only."

18

This provision does not limit the landlord in any other way. Based on the ambiguous language used here, the landlord may terminate the lease when it decides to place the property "for sale." The lease does not contain a right of first refusal clause, giving the applicant-tenant the right to purchase the property under the same terms and conditions made by a bona fide purchaser in an arm's-length transaction.

Furthermore, the lease document purportedly "signed" by the applicant and the owner of the property does not include the dimensions of the parking lot and an architectural drawing showing the number of "clearly marked" parking spaces the lot would accommodate. Finally, the Board's resolution directed that "[a]ll employees of the business shall use the off-site parking area." This is in direct violation of the plain language of Section §250-61.3, which requires off-site parking to be "available only for use by <u>patrons</u> of such business or property." (Emphasis added).

Independent of these impediments, plaintiff also raised a number of practical and legal concerns about the Board's ability to enforce a number of key aspects of this off-site parking arrangement. The applicant's planner candidly testified that the restaurant's business model depended on maximizing the use of the available seating capacity. In response to concerns raised by the Board at

19

the February 17, 2016 meeting, the applicant reduced the number of seats by reconfiguring the internal layout of the restaurant, while leaving the structure's architectural footprint intact. The efficacy of the valet parking requirement, as a means of mitigating the negative effect on-street parking would have for area residents, is entirely dependent on the willingness of the patrons to use this amenity. Furthermore, valet service itself would unavoidably exacerbate traffic congestion in the area. These disruptive factors are inextricably linked to the scale of the applicant's project. Reducing the size of the restaurant to conform to the property's capacity to provide on-site, off-street parking would eliminate this problem. Whether this alternative is economically feasible or consistent with the applicant's business model is not a valid zoning consideration.

Based on our de novo review, we conclude the Law Division erred in finding the applicant's proposed lease to provide off-site parking satisfied the requirements of Section 250-61.3 of the Ordinance of the City of Somers Point. The Board's July 20, 2016 resolution approving the applicant's Preliminary and Final Major Site Plan is vacated.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5476-16T3