210 N.J. Super. 174 (1986)
509 A.2d 277
RICHARD P. DEGNAN, WILLIAM H. O'NEIL, RAYMOND SMITH, BADONA REELE, LYNN LUPPINO, AND MARK GUARINO, PLAINTIFFS-APPELLANTS,
v.
ROBERT B. MONETTI, THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF BERKELEY, JOHN ZACCARO, INDIVIDUALLY, MICHAEL HALE, INDIVIDUALLY, ROBERT PRICE, INDIVIDUALLY, JOSEPH BRUSCINO, INDIVIDUALLY, THEODORE KOZLOWSKI, INDIVIDUALLY, AND ARTHUR STEIN, INDIVIDUALLY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 1986.
Decided May 23, 1986.
*176 Before Judges MORTON I. GREENBERG and LONG.
Charles H. Brandt argued the cause for appellants.
Richard D. Stanzione argued the cause for respondent Robert B. Monetti (Stanzione, Stanzione, Martone & Rosen, attorneys; Richard D. Stanzione and Joseph F. Martone, on the brief).
*177 Arthur Stein argued the cause for respondents The Board of Adjustment of the Township of Berkeley, John Zaccaro, Michael Hale, Robert Price, Joseph Bruscino, Theodore Kozlowski and pro se (Curry, Stein & Bennardo, attorneys; Arthur Stein on the brief).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This case comes on before this court on appeal from orders for partial summary judgment and final judgment dismissing plaintiffs' action seeking to set aside a use variance (N.J.S.A. 40:55D-70(d)) granted to defendant Robert Monetti by defendant Board of Adjustment of the Township of Berkeley. The matter originated when Monetti filed an application for a variance to construct 20 condominium units in the Township of Berkeley. A variance was required as the property was zoned for single family homes on 5,000 square feet lots which would permit the construction of seven single family dwellings. Prior to the first hearing on the application, Monetti reduced his proposal to 18 units to be built in four buildings.
At the hearings on the application the evidence showed the property to be a 35,000 square feet tract on a barrier island near a waterway called the "bay." The parcel abuts Island Beach State Park and is the site of an inoperative sewerage treatment plant. The structures remaining from the sewerage operation include a one story brick building, a 10 feet by 12 feet by 14 feet concrete "degritter" and a 70 feet by 60 feet concrete sewerage tank.
Defendant Monetti, an experienced builder-developer, purchased the land in 1984 from the Berkeley Sewerage Authority for $276,000. The authority had set a minimum price for the property of $275,000. Prior to the purchase Monetti did not have the property appraised but he was aware of the zoning and acquired the property with the intent to seek a variance. *178 In fact, Monetti filed his application even before he closed on the parcel.
Monetti called Ronald Cebrick, an architect, and George Lissenden, an engineer, as witnesses. Cebrick and Lissenden described the proposed architecture and landscaping of the project with Cebrick emphasizing how the units were designed, because of the "uniqueness" of the site, to maximize the view of Island Beach State Park and the bay. Cebrick also testified that by placing the units into four separate buildings open spaces would be maintained in the development.
Monetti also called a planning expert, John Maczuga, as a witness. Maczuga considered the property unique because of its proximity to the park. Further, he indicated that its view of the bay was one of the "prettiest" in the entire area. Maczuga believed that condominium development would not substantially impair the intent of the zoning plan or master plan of Berkeley Township. He noted that "[t]he bulk of the existing development along the park frontage and along the ocean front is also intense" and the surrounding area includes a variety of uses in addition to single family dwellings. Specifically, he said there were at least seven condominium projects in the area, several of which received zoning approval from the board of adjustment. Maczuga believed the project would not create any parking problems. Maczuga was so enthusiastic about the property that, in his opinion, because of its finite character and unique features more people should be allowed to use it than would be accommodated by limiting it to single family development.
Monetti testified at length, focusing on the costs of development and potential selling price of the proposed units as compared with the costs and selling price for single family dwellings. Monetti calculated that the cost for development of the parcel into lots for single family dwellings would be $60,000 per lot, with the principal items being the acquisition cost of $276,000 and the $100,000 to $120,000 required to clear the lots of the remains of the sewerage plant. He testified that it would *179 cost $150,000 to build a high quality house, a calculation assuming a $75 a square foot construction cost. Accordingly, he would have to sell single family homes on the parcel for $250,000 to $260,000 to earn a profit. Monetti believed that houses would not sell in the area at that price and consequently the profit in constructing such homes would be meager.
Monetti saw a far more favorable picture when he contemplated building condominiums. He thought that the construction costs for a condominium project of a quality comparable to the single family home development he described would be between $50 and $60 a square foot. He concluded the condominiums could be sold for around $175,000.
Monetti also produced Arthur Williamson, Jr., a real estate expert, as a witness. Williamson confirmed that there were varied uses which included single family dwellings in the area surrounding the parcel. He also testified that the annual turnover rate, three per cent, for single family houses in the area was lower than normal and that there was a lack of resort residential housing in the area. He attributed the lack of turnover to a shortage of available houses rather than an absence of potential buyers. Part of the housing shortage was attributable to conversion of summer housing into year-round housing. Williamson indicated that because of demographic shifts there is now an increased demand for "more luxury type of townhouses in the resort area." In Williamson's view, development of the property for condominiums would not tax existing municipal services but would enhance the value of nearby properties. Williamson admitted, however, that a benefit in value to the surrounding properties would also result from a single family dwelling project, as the sewerage treatment plant would be removed to accommodate such construction. Williamson agreed with Monetti's assessment of the housing market and stated that he could not anticipate seven people spending $240,000 each for a house in the area of the parcel.
*180 After Monetti completed his case, the objectors presented witnesses. Richard Coppola, a planning expert, testified that the proposed development would work a substantial detriment to the public good as it would allow a threefold increase in the density of dwelling units per acre over that allowed by the zoning ordinance. John M. Sisto, Jr., a demolition contractor, testified that removing the remains of the sewerage treatment plant would cost approximately $50,000. Sisto admitted, however, this figure was predicated on leaving a concrete slab and if that was not possible he would accept the figure of $100,000 provided by Monetti.
Raymond A. Birchler, a real estate expert, testified for the objectors. Birchler indicated that a house of 1,617 square feet could be built for about $48 per square foot, for a total construction price of $78,100, a cost including a builder's profit of 13%. Thus, if the $60,000 per lot land cost was added to the construction cost a house could be built on the parcel for $138,000.
After the testimony was completed and the attorneys argued the case, the board considered the application on September 20, 1984. The vote was four affirmative, two negative and one abstention. The board attorney then advised the board that the abstention was in effect a vote to deny as five affirmative votes were required for approval. After a short recess the application was again brought to a vote and this time was approved as the previously abstaining member voted affirmatively. Subsequently, on October 10, 1984 the board adopted a formal resolution approving the variance for 18 units. The resolution, after making findings, cited the following as special reasons for granting the variance:
1. A desirable visual environment can result.
2. There will be no undue burden imposed upon neighboring property owners as a result of such development.
3. The site is peculiarly suited for the proposed use.
4. The site is not more reasonably adapted to a conforming use.
5. The site is properly suited for recreational housing.

*181 6. The site is located on a valuable and scarce vista, to wit: Island Beach State Park.
7. The development will tend to establish appropriate population densities that will contribute to the well-being of persons and neighborhoods and will restore the environment.
8. The proposed development will provide space for resort recreational housing.
9. The proposed development will tend to conserve energy through the use of planning practices designed to do so.
10. The cost of restoration of the site is prohibitive for any permitted use and would for all intents and purposes render development of any permitted use unfeasible.
11. The site is the location of structures which are unique to this area and make restoration of the site costly and difficult.
12. The site contains structures which cannot be reutilized for a permitted purpose in this zone.
The board also found that granting the variance would not result in a substantial detriment to the public good and would not substantially impair the intent and purpose of the zoning plan and zoning ordinance.
On November 30, 1984 plaintiffs filed a complaint in lieu of prerogative writs seeking reversal of the board's approval of the application on the procedural grounds that the second vote was illegal and that private discussions during the recess violated the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq. Plaintiffs substantively asserted that in granting the variance the board had acted arbitrarily, capriciously and unreasonably. Monetti and the board filed separate answers to the complaint.
The case was decided by decisions on two separate days. On April 19, 1984, on an application for partial summary judgment, the judge dismissed the complaint insofar as it alleged a violation of the Open Public Meetings Act as he found that there was no violation and in any event the complaint under that act was not timely. After the judge rejected plaintiffs' application to take testimony with respect to reasons for the change in the vote, a trial on the record was held on the remaining issues. The judge concluded that the second vote was not improper and the board did not act arbitrarily or capriciously in granting the variance. He noted that there was a presumption that the *182 board's action was valid and the record supported a finding that the construction and sale of single family homes may not have been feasible, thus throwing into doubt the question of whether without the variance the property could be developed. The judge considered that unless the property was developed it would remain an eyesore. On June 12, 1985 the judge signed an order dismissing the action.
Plaintiffs appeal raising procedural issues regarding the second vote, the judge's refusal to allow them to present testimony and the alleged violation of the Open Public Meetings Act. In addition, they contend that for substantive reasons the variance should not have been granted.
Ordinarily we would first consider the procedural issues but here we deal instead with the substantive contentions as we are satisfied that plaintiffs are correct with respect to them. Thus the procedural issues need not be reached. By disposing of the appeal substantively we benefit the parties by bringing the matter to a conclusion.
Under N.J.S.A. 40:55D-70(d), a board of adjustment may grant a variance from the zoning ordinance to permit a use or principal structure in particular cases for special reasons if the variance can be granted "without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." While the statute does not define what circumstances will constitute special reasons, the Supreme Court has indicated that as no precise formula is feasible each case must turn on its own circumstances. See Kohl v. Mayor and Council of Fair Lawn, 50 N.J. 268, 276 (1967). Further, a special reason should advance the purposes of zoning. See Kessler v. Bowker, 174 N.J. Super. 478, 485 (App.Div. 1979), certif. den. 85 N.J. 99 (1980). It is, of course, well recognized that the local officials are best equipped to pass on variance applications and must be given wide latitude in the exercise of their discretion. See Kramer v. Bd. of Adjust., Sea Girt, 45 N.J. 268, 296 (1965). Nevertheless, variances *183 to allow new nonconforming uses should be granted only sparingly and with great caution as they tend to impair sound zoning. Kohl v. Mayor and Council of Fair Lawn, supra, 50 N.J. at 275. A court in reviewing the granting of a variance will determine whether the findings and conclusions of the zoning board are supported by the record, and whether the board acted arbitrarily. Evesham Twp. Bd. of Adj. v. Evesham Tp., 86 N.J. 295, 302 (1981); O'Donnell v. Koch, 197 N.J. Super. 134, 141 (App.Div. 1984). In reviewing the record before the board, the question is "whether the special reasons, taken as a whole, are founded affirmatively in one or more of the zoning objectives" of the zoning act. Kramer v. Bd. of Adjust., Sea Girt, supra, 45 N.J. at 287. We review this case in light of the foregoing principles.
In substance, though the board set out 12 special reasons for granting the variance, they are of two types. Firstly, the board believed the project in itself would be desirable, a finding which seems to be independent of the present physical condition of the property. Secondly, by allowing the project to be built the property would be cleared of the remains of the sewer plant.
We deal initially with the first type of special reason. The board thought that the project would be attractive, was appropriate for the site, would enjoy the unique vista of the park, would supply resort recreation housing and would conserve energy. While we do not question these conclusions, the difficulty with them is that there is no basis to conclude from the record that single family homes would also not be appropriate for this desirable area. The fact that there is a need for resort recreational housing can hardly justify the variance, for if a variance could be granted simply because of a supposed need for a use, zoning ordinances would become meaningless. It seems clear to us that if there are special reasons for a variance because of the nature of the use it should be because the use inherently serves the public good or welfare. Compare Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough, *184 47 N.J. 211, 217 (1966), and Weiner v. Zoning Bd. of Adjust. of Glassboro, 144 N.J. Super. 509, 515 (App.Div. 1976), certif. den. 73 N.J. 55 (1977), respectively indicating that because of the nature of the uses special reasons exist for variances for regional high schools and senior citizens housing developments, with Shields v. Bd. of Adjustment Tp. of Mansfield, 133 N.J. Super. 418 (App.Div. 1975), holding that no special reasons exists because of the usage to allow a variance for a tennis club with related facilities. While we do not suggest that the project would be undesirable, it hardly would be important to the public good or welfare. Further, the fact that the attached structures would be more energy efficient than single family homes cannot be the basis for relief as that would always be the case.
We recognize, of course, that as an economic matter the record supports a conclusion that in consideration of Monetti's acquisition cost, single family dwellings are not practical for the premises. But quite aside from the general reluctance of the courts to consider economics in reviewing applications for special reasons use variances, see Cerdel Constr. Co., Inc. v. East Hanover Tp., 86 N.J. 303 (1981), there are particular reasons why such factors should not be considered here. Monetti acquired the property with the intention of seeking a variance for condominiums. A major cost factor in any development on the property is clearly the cost of acquiring the property and removing the remains of the plant. Monetti finds himself in an unfortunate economic situation because he voluntarily put himself there. In short, we see no reason why he should be aided in extricating himself from what may not have been a wise purchase by being granted a variance. We are particularly emphatic on the point because it is clear beyond doubt that the property is highly desirable and, except for the cost of purchase, would be a suitable site for single family development.
We have, of course, not lost sight of the circumstance that the sewerage authority set a minimum price of $275,000 for the *185 property. We conclude, however, that this fact is not germane. Certainly neither Monetti nor anyone else was compelled to acquire the property at that or any price. If Monetti believed the price was too high to allow development of the property in accordance with the zoning, he simply should not have purchased it. Had no purchaser met the authority's price it would have been encouraged to reconsider the minimum price. In any event the authority by its setting of a price could not compel the board to grant a variance.
As we indicated, a second basic reason for granting the variance relates not to what will be built but rather what will be removed. But in the circumstances of this case we do not regard removal of the sewerage facilities, desirable as that may be, as a special reason for granting the variance for there is no question but that development of the property in accordance with the zoning ordinance would have exactly the same remedial consequence. Further, as there are no impediments to constructing single family dwellings on the property except for the cost of acquiring and clearing the land, a factor we will not consider, the positive goal of removing the structures should be attained in accordance with the ordinance.
There is another consideration in this case which should not be overlooked. Monetti acquired the property from the sewerage authority, a public agency. While we do not know why the authority set a minimum price of $275,000, we do know that when Monetti acquired the land it was not zoned for condominium development. We are further aware that often when the intensity of use on a property is increased its value is enhanced and, indeed, the record here supports and probably requires the conclusion that the property would be worth more with than without the variance. While we do not suggest that a purchaser of a property from a public agency should be precluded from subsequently obtaining a use variance for its development, we do think that when the variance results in enhancement of the value of the property immediately after its *186 acquisition, it should be carefully scrutinized. We so conclude for in those circumstances the combination of the official acts of selling the property and granting the variance could reasonably be perceived by the public as having given a windfall to the purchaser of the property.
In this regard we note Vaccaro v. Asbury Park Enterprises, 42 N.J. Super. 288 (App.Div. 1956), in which we invalidated municipal action waiving a condition regarding construction on land sold by the City of Asbury Park to a private person. We there considered the issuance of a building permit to allow construction not consistent with the condition to be a legal fraud on the public. Id. at 295. While we do not suggest that there was any legal fraud here and certainly do not imply that there was any wrongdoing, we nevertheless are buttressed in our result by Vaccaro.
Overall, notwithstanding the deference which we pay to the decision of the board, we find no basis to sustain its action or the judgment in the trial court in dismissing this case. Accordingly, the judgment of June 12, 1985 is reversed and this matter is remanded to the Superior Court, Law Division, Ocean County, for entry of an order invalidating the variance.