**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-0953-23
                       A-0977-23

ART AMMERMULLER,
STEVEN BLOOM, and
LINDA BLOOM,

     Plaintiffs-Appellants,

v.

BOROUGH OF BELMAR ZONING
BOARD OF ADJUSTMENT,
EDELMAN INVESTMENT GROUP,
LLC, 108 12th AVENUE REDEVCO,
LLC, and RAINBOW
HOSPITALITY, INC.,

     Defendants-Respondents.
_____

BRIAN MATTHEWS and
CECELIA MATTHEWS,

     Plaintiffs-Appellants,

v.

EDELMAN INVESTMENT
GROUP, LLC, 108 12th
AVENUE REDEVCO, LLC,

RAINBOW HOSPITALITY,
INC., and THE ZONING BOARD
OF ADJUSTMENT OF BELMAR,

Defendants-Respondents.

_____

Argued February 4, 2025 – Decided February 25, 2025

Before Judges Firko, Bishop-Thompson, and Augostini.

On appeal from the Superior Court of New Jersey, Law Division Monmouth County, Docket Nos. L-0779-23 and L-0889-23.

Daniel L. Steinhagen argued the cause for appellants Art Ammermuller, Steven Bloom, and Linda Bloom (Beattie Padavano, LLC, attorneys; Daniel L. Steinhagen, of counsel and on the briefs; Ira E. Weiner and Alexander J. Morgenstern, on the briefs).

Lawrence H. Shapiro argued the cause for appellants Brian Matthews and Cecelia Matthews (Ansell Grimm & Aaron, PC, attorneys; Lawrence H. Shapiro and Brian J. Ashnault, on the briefs).

Kevin E. Kennedy (Law Offices of Kevin E. Kennedy, LLC) argued the cause for respondent Belmar Zoning Board of Adjustment.

Donna Marie Jennings argued the cause for respondents 108 12th Belmar Redevco, LLC, Edelman Investment Group, LLC, and Rainbow Hospitality Inc. (Shamy Shipers & Lonski, PC, and Wilentz Goldman & Spitzer, PA, attorneys; William J. Shipers and David P. Lonski, of counsel; Darren M. Pfeil, on the brief).

A-0953-23

PER CURIAM

In these consolidated appeals, plaintiffs Art Ammermuller, Steven Bloom, Linda Bloom, Brian Matthews, and Cecelia Matthews appeal from an October 19, 2023 Law Division order affirming a resolution of defendant Borough of Belmar Zoning Board of Adjustment (Board) that granted defendant Edelman Investment[1] Group, LLC's (Edelman) application for variance relief, design waivers, and site plan approval. We affirm.

I.

Edelman is the contract purchaser of lots 12 and 13 located in Belmar's A-75 zone, which permits only single-family homes. At the time of the application, the two lots were also subject to an MF-75 overlay zone, which would have permitted "multi-family attached 'townhouse style' cluster development" as a conditional use within the R-75 zone, in order "to allow for the transition from existing high density residential uses, exceeding seven dwelling units per lot, hotels and boarding houses . . . ."

---

[1] Also referred to as "Investments" in the record.

A-0953-23

As Edelman sought to raze the existing non-conforming uses on lots 12 and 13—a forty-unit rooming house known as the Belmar Inn,[2] a single-family home, and a two-family home in the rear—it sought attendant use and bulk variances in accordance with N.J.S.A. 40:55D-70(c) to (d)(1), (4), (6). Specifically, Edelman applied for a use variance to allow for a four-story multi-family use in a single-family zone. Edelman also sought the following variances:

(1) <u>Combined Side Yard</u>: proposed 10 feet to balcony, with 15 feet required;

(2) <u>Rear Yard</u>: proposed 18 feet, with 40 feet required;

(3) <u>Height</u>: proposed 4 stories/42.5 feet to the roof, with 2 1/2 stories/35 feet permitted;[3]

(4) <u>Maximum Building Coverage</u>: proposed 71.11% with 20% permitted;

(5) <u>Maximum Impervious Coverage</u>: proposed 80.01% with 55% permitted;

---

[2] In our opinion, we refer to the "rooming house" and "Belmar Inn" interchangeably.

[3] As explored during the Board hearings, the 42.5 feet height measurement was to the flat roof of the building. However, the building would measure 57.2 inches to the rooftop elevator, 52 feet to the proposed bathrooms in the elevator lobby, and 52 feet to the stair tower.

(6) <u>Maximum Floor Area Ratio</u> (FAR): proposed 173% (without considering the parking garage), with 50% permitted;

(7) <u>Parking</u>: proposed 47 spaces with 48 required;

(8) <u>Width of Curb Cut</u>: proposed two curb cuts greater than 12 feet wide; and

(9) <u>Flat Roof</u>: proposed flat roof with amenity deck.

The style of the building was described as "classic European beach condominiums inspired by the French and Italian Riveras, timeless in design" with "sand-colored stucco."

The Board held six hearings over the course of a year. Edelman's architect Mary Hearn testified the "whole aesthetic" of the proposed building was "traditional" and "in keeping with most of what's getting built in the Borough." Hearn testified that each unit would have two bedrooms and two or two-and-a-half bathrooms. Hearn explained the roof would be flat with an amenity deck serviced by an elevator and two stairwells.

Edelman's traffic expert Scott Kennel testified the parking would be adequate to accommodate the needs of the building. Kennel noted "very few" multi-family dwellings in Belmar satisfied the residential site improvement standards parking criteria and opined that the proposed development would improve the existing parking situation, with lot 12 providing no parking for

5

residents and employees of the Belmar Inn, and lot 13 providing stacked parking for its three dwelling units, serviced by a driveway easement across lot 12.

Theodore J. Lamicella, Edelman's real estate expert, opined that a condominium development was fiscally the "highest and best use" of the property. Lamicella testified that it was not financially feasible to construct single-family units in light of the $3.4 million dollars in existing and/or developed value of the properties, assuming undeveloped single-family lots sold at $700,000 each.

Richard DiFolco, Edelman's engineer and planner, testified that the Belmar Inn was a "blight" and presented evidence that the Belmar Inn had a history of public safety violations, including hazardous conditions within the building, and problematic behavior by residents. DiFolco stated that the Belmar Inn drained municipal services, stigmatized the neighborhood, and stalled redevelopment as compared with most blocks in the Borough. Additionally, the property on lot 13 had been cited for quality-of-life violations, and it was characterized as "an animal house."

DiFolco testified the proposed development "complies more with [the MF-75] criteria than it does with the single family [RF-75] criteria" and that the proposed condominiums were consistent with the municipality's adoption of the

6

MF-75 overlay zone in an attempt to encourage "density redevelopment" of the properties. He also characterized the proposed condominiums as "horizontal townhouses" or "side-by-side, floor-by-floor townhouses."

DiFolco maintained that the proposed development furthered goals from the 2016 master plan reexamination, and satisfied the positive and negative criteria, by: eliminating the existing uses, which were non-conforming and a blight on the community; attracting an unappealing, undesirable, transient clientele, and had a negative impact on the health, safety, and welfare of the community; promoting redevelopment of the neighborhood; promoting increased property values and tax revenues; attracting more affluent, permanent/year-round residents, likely with fewer children such that the school system would not be burdened; improving and expanding the housing stock to modern standards and needs; improving the streetscape and visual environment; providing for little traffic or noise, and no substantial decrease in air, light, and open space given the oversized lot and open parking garage; providing on-site, ground-level parking and elevated living areas, thereby providing safety from flooding; providing for stormwater runoff sufficient to account for a two-year storm volume with no discharge; providing for solar electric panels on the roof;

7

and providing handicapped and electric vehicle (EV) parking in line with federal, state, and local priorities.

As for why the property was "particularly suited for the proposed use," DiFolco noted that the site had historically been used as a multi-family dwelling; the proposed use would eliminate a blight; the site is adequately sized for the proposed use; the proposed development would result in a decrease in the intensity of the use as compared to the presently existing uses; the municipality had allowed multi-family development on the property, of similar size and density, through the MF-75 overlay zone; and there were numerous multi-family dwellings in the area.

DiFolco testified there would be no negative impact on the surrounding property owners "[c]onsidering what we're removing" and "the positive impact . . . from aesthetics and from [an] economic point of view." Public commenters who supported the proposed development felt it was the only way to get rid of the Belmar Inn. The Board also considered testimony from Ryan Dullea, a fire official, Robert Poff, a code enforcement officer, and the Matthews.

Objectors complained about the "overwhelming" size of the proposed building, which they maintained was inconsistent with the aesthetics and character of the much smaller buildings in the neighborhood, and was "wildly

8

out of compliance" with Belmar's master plan and zoning ordinance.  They also complained that the proposed development would:  exacerbate traffic and parking issues; produce noise, fumes, and lights from the parking garage; as well as noise from the rooftop air conditioning units, rooftop amenity deck, and balconies; have a negative effect on the light, air, and open space, with the building depriving neighboring residents of ocean breezes and sunlight, and casting shadows that would reduce the effectiveness of their solar panels; impinge upon the privacy of neighboring properties, with the balconies set back only 10 and 16 feet from the property line, whereas 40 feet was required; and cause increased flooding due to so much impervious coverage.

Finally, the Matthews's planner, Peter G. Steck, testified that the notice of the proposed development was defective because it did not accurately describe the project and the variances required.  Steck also opined that the proposed development would have an enormous footprint and excessive height, and be inconsistent with the character of the neighborhood, which consisted largely of one-story to two-and-a-half story residences, with the exception of the Belmar Inn, which had two three-story towers connected by a lobby area.  Steck opined that the proposed development was inconsistent with Belmar's master plan, under which multi-family uses were being cut back rather than encouraged.

9

As to the latter two opinions, Steck testified the proposed development was largely inconsistent with the standards for the R-75 zone such that the variances requested represented significant deviations from the zoning ordinance and would provide less open space than the existing Belmar Inn.

Furthermore, while the Borough had created the MF-75 overlay zone in order to incentivize the removal of the Belmar Inn, the MF-75 zoning would permit only townhouses as a conditional use, with a permissible density of 28 dwelling units per acre and a maximum height of 35 feet (3 stories). Edelman had requested condominiums, not townhouses, and at a density of 49.8 dwelling units per acre and a maximum height of 57 feet 2 inches (5 stories) to the rooftop appurtenances. Steck explained that Edelman had requested building coverage, impervious coverage, and a FAR that far exceeded what would be permissible with the construction of townhomes and buffers that were inconsistent with the 25-foot buffer required for multi-family developments abutting single family residences.

Citing Medici,[4] Steck stated the proposed development is "big" and "obnoxious" and did not satisfy positive and negative criteria for obtaining the necessary variances. Steck explained the property was "regular in shape" and

---

[4] Medici v. BPR Co., 107 N.J. 1 (1987).

A-0953-23

could "easily accommodate" three or four buildings while complying with all of the setbacks and height limits and pervious green areas required for the R-75 zone. In Steck's view, the proposed development significantly deviated from the applicable zoning limits, and it should be handled by "the governing body" as a "legislative matter" rather than through variances issued by the Board.

The Board granted Edelman's application in a 6 - 1 vote and detailed its factual findings and legal conclusions in a 156-page resolution. The Board concluded that Edelman's application satisfied the positive and negative criteria for the requested "d" variances under N.J.S.A. 40:55D-70, provides a unique opportunity for the Board to eliminate the pre-existing non-conforming use, and "represents a better overall [z]oning alternative for the Borough of Belmar."

In terms of the positive criteria, the Board found: "[t]he Borough's [m]aster [p]lan essentially evidences an intent to reduce the number of [r]ooming [h]ouse dwellings or non-conforming structures within the [m]unicipality – and approval of the within [a]pplication will help achieve such a goal." The Board added the proposed development would "advance[] the goals and purposes" of the [Municipal Land Use Law (MLUL)], N.J.S.A. 40:55D-1 to -171, by "reduc[ing] the overall nature/extent of a pre-existing non-conforming use."

The Board further found that the proposed condominium development would likely "improve the value of surrounding properties" and "improve the quality of life for neighboring property owners" and "promote the public health, safety, and general welfare." As to this factor, the Board noted the "incident history" of the Belmar Inn between 2015 and 2020. The Board also found that the proposed condominiums: would not have a significant traffic impact, would provide sufficient parking, whereas the existing uses did not; would provide safer on-site traffic and pedestrian circulation; and would not generate significant noise with their rooftop air conditioning units.

Additionally, the Board found the proposed structure to be architecturally and aesthetically pleasing, would increase the values of surrounding properties, and "significantly upgrade the housing stock of the Borough." Given the design, with step-backs and balconies, the Board found the condominiums would not have an overwhelming, massive, or out of scale appearance, and they would allow for "an appropriate amount of air, space, and light" consistent with the MLUL. The Board also noted the proposed condominiums would appear residential and improve the overall "curb appeal" of the property as compared to the existing, aged rooming house that suffers from deferred maintenance, has

12

a commercial appearance rather than residential, and has exceeded its useful life span.

Focusing specifically on the MLUL, the Board found that the proposed condominiums would further the purposes of the statute by: eliminating a pre-existing non-conforming use; reducing the intensity and density of the use, and providing adequate parking and less overall traffic; providing a building that complies with modern building and construction codes including those relating to wind, fire, and flood; providing adequate light, air, and open space in their design and landscaping; providing for stormwater management; providing for energy efficient and renewable energy features including modern windows, doors, insulation, and air conditioning units; EV charging stations; solar panels; and providing a new housing alternative near the ocean. The proposed condominiums also would be compliant with the Americans with Disabilities Act (ADA),[5] whereas the Belmar Inn is not.

Focusing on the goals and objectives of the Borough's master plan, the Board found that the proposed condominium development promoted those goals and objectives by: encouraging and promoting economic development by spurring reinvestment and rehabilitation in the neighborhood; preserving the

---

[5] 42 U.S.C. §§ 12101-12213.

residential character of the R-75 zone by eliminating the existing rooming house and conforming to uses in the surrounding area; and providing another form of year-round housing in the Borough.

With respect to the negative criteria, the Board found the proposed development would not cause substantial detriment to the public good. The Board noted elimination of the rooming house and construction of the condominiums would be beneficial.

In concluding the FAR variance should be granted, the Board recognized that the proposed FAR of 173% was a "significant deviation" from the permitted maximum of 50%, but also commented that the FAR of the existing structures was 116%. Thus, the Board concluded that the site could accommodate the proposed FAR deviation, with sufficient parking, stormwater runoff containment, elimination of the existing uses, reduction of the overall density and intensity of use, and a new structure that "to an extent, maximizes light and air both on the site and to the adjacent properties." The Board explained:

> Had the within [a]pplication involved a vacant, undeveloped, and undisturbed piece of land, perhaps the FAR [v]ariance might not have been granted. However, given the fact that the site hosts a pre-existing non-conforming [r]ooming [h]ouse [u]se, and the [l]ot 13 portion of the site hosts 3 non-conforming dwellings, given the fact that pre-existing non-conforming [r]ooming [h]ouse [u]ses are allowed to

continue to exist (in the absence of demolition or abandonment), and given the fact that the existing non-conforming [r]ooming [h]ouse [u]se will be officially abandoned in conjunction with the within approval, a majority of the Board [m]embers were inclined to grant the [a]pplicant's requested FAR/[v]ariance relief.

The Board granted the height variance finding the height of the proposed building would "not be out of character, or otherwise inconsistent, with the height of other structures in the area," and was not significantly different than the height of the existing rooming house. The Board concluded that the height variance could be granted without causing substantial detriment to the public good.

Finally, the Board granted the requested use variance. As to this issue, the Board surveyed the various uses in proximity to the subject property, which included multi-family homes, multi-family rooming houses, condominiums, and apartments, seasonal rental units, winter rental units, single family homes, and commercial hotels and determined that "[m]ulti-family housing is not uncommon in the subject portion of the R-75 zone and immediate area," notwithstanding the single family zoning designation.

The Board concluded: "[m]ulti-family housing in the area of the development site is not unusual. As such, the Board finds that the use approved herein is consistent with other uses in the neighborhood/area," and the proposed

15

use would "blend in with the surrounding uses, from an operational standpoint, from an aesthetic standpoint, from a noise standpoint, from a traffic standpoint, and from a parking standpoint." And the Board again compared the proposed use to the current rooming house use, finding the proposed condominiums to be "more benign" and "less intense" than the rooming house use, and "more similar to and consistent with" the permitted single-family use.

The Board rejected the objectors' argument that approval of Edelman's application would constitute impermissible spot zoning or re-zoning of the property, given the pre-existing non-conforming 40-unit rooming house. The Board determined approval of Edelman's application would result in "demolishing the rooming house" and promote a "comprehensive zoning plan" without substantially altering the character of the district. Turning to the requested "c" bulk variances, the Board found that the record warranted granting the variances for the reasons expressed in connection with the "d" variances.

On March 13, 2023, plaintiffs Art Ammermuller and Steven and Linda Bloom filed a complaint in lieu of prerogative writs challenging the Board's resolution. On March 23, 2023, Brian and Cecelia Matthews filed a separate complaint in lieu of prerogative writs seeking the same relief. Plaintiffs collectively maintained Edelman failed to provide the requisite proofs to support

the requested height, density, and bulk variances, that the Board's decision was arbitrary, capricious, and unreasonable, and the grants of the "d" and "c" variances did not satisfy the criteria for the granting of such variances under the MLUL.

Edelman named as defendants 108 12th Avenue Redevco, LLC, and Rainbow Hospitality, Inc., the accompanying business entities, and filed answers to both complaints, as did the Board. The court consolidated the two cases.

After hearing oral arguments, the court entered an order accompanied by a thirty-two-page written decision in which it concluded the Board's decision to grant Edelman's application was neither arbitrary, capricious, nor unreasonable. The court found the resolution was "exhaustive," "detailed, comprehensive, [and] fact-sensitive." The court determined the resolution supported both the positive and negative criteria for the grant of a use variance, highlighting the Board's finding that the site was "particularly suited" for the proposed condominium use based upon the historical, more intensive rooming house use, and the existence of numerous multi-family developments in the vicinity. The court also noted the Board's findings that multiple MLUL factors were furthered by the proposed development.

As for the negative criteria, the court noted the Board's finding that the proposed development could be granted without substantial detriment to the public good, because the development would entail removal of the Belmar Inn and construction of a "less intense, more modern, residential complex with improved aesthetic appeal, modern construction, and myriad engineering enhancements designed to reduce flooding near the Atlantic Ocean."

The court also found the use variance does not substantially impair the intent of the zone, zoning ordinance, or master plan, based upon the Board's finding that "economic development was a component of the [m]aster [p]lan," and "[b]y eliminating the outdated, eyesore of the Belmar Inn and replacing such with the modern, aesthetically pleasing condominium complex, economic development is enhanced as Belmar will be viewed by visitors and residents in a more appealing and welcoming light."  The court observed that "[t]he proposal too promotes the community's residential character and provides an additional range of housing options to Belmar in the form of year-round occupancy options in a manner more consistent with the neighborhood and surrounding uses than the existing use."

The court rejected plaintiffs' argument that the Board acted arbitrarily, capriciously, and unreasonably and exceeding its authority by "impermissibly

18

relying on a desire to replace an existing non-conforming use—the Belmar Inn." The court relied on <u>Kramer v. Bd. of Adjustment</u>, 45 N.J. 268 (1965), and rejected reliance on <u>Degnan v. Monetti</u>, 210 N.J. Super. 174 (App. Div. 1986), deeming <u>Degnan</u> to be "a jurisprudential cul de sac," and an "outlier," and concluding that the Board had not engaged in impermissible spot zoning.

The court also rejected both plaintiffs' and defendants' reliance upon the MF-75 overlay zone, since the overlay zone was "not germane" to the issues. The court reasoned Edelman did not seek to develop the property based upon the MF-75 regulations; instead, it sought variances from the R-75 regulations. The court emphasized Belmar's revocation of the overlay zone after the Board's resolution was irrelevant to its consideration because under N.J.S.A. 40:55D-10.5, the application was governed by the zoning regulations in place on the date of submission. Finally, the court found that the record supported the Board's approval of the FAR, height, and bulk variances. This appeal followed.

On appeal, plaintiffs primarily argue the Board acted arbitrarily, capriciously, and unreasonably in approving Edelman's application. Plaintiffs contend the application did not provide proof of both the positive and negative criteria required to obtain a use variance under N.J.S.A. 40:55D-70(d)(1).

Plaintiffs maintain Edelman did not prove that special reasons exist to permit a "multi-family residential apartment-type building" in the R-75 single-family residential zone, and the Board's resolution is not based on substantial credible evidence in the record to justify approval. Plaintiffs assert the court's affirmance of the Board's approval was "predicated on illegal considerations," and the FAR variance approval should have been reversed by the court. Plaintiffs also claim Edelman failed to provide adequate and proper notice to the public in accordance with the MLUL.

We disagree with all of these arguments and affirm substantially for the reasons detailed in the court's well-reasoned and thorough written decision. We provide the following comments to amplify our decision.

## II.

"Our standard of review for the grant or denial of a variance is the same as that applied by the Law Division." Advance at Branchburg II, LLC v. Twp. of Branchburg Bd. of Adjustment, 433 N.J. Super. 247, 252 (App. Div. 2013). We defer to decisions of local boards if they are adequately supported by the record, Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 61 (1999), and if they are not arbitrary, unreasonable, or capricious, Pullen v. Twp. of S. Plainfield Planning Bd., 291 N.J. Super 1, 6 (App. Div. 1996). Further, a zoning "board's

decisions enjoy a presumption of validity, and a court may not substitute its judgment for that of the board unless there has been a clear abuse of discretion." Price v. Himeji, LLC, 214 N.J. 263, 284 (2013). A board's factual determinations are entitled to "great weight" and should not be disturbed "unless there is insufficient evidence to support them." Rowatti v. Gonchar, 101 N.J. 46, 52 (1985).

When reviewing a board decision, a court must consider the issues before the board in their entirety and not focus on the legal sufficiency of one factor standing alone. Kramer, 45 N.J. at 287. For example, a court cannot consider a variance in isolation, but must consider it "in the context of its effect on the development proposal, the neighborhood, and the zoning plan." Pullen, 291 N.J. Super. at 9.

Generally, an applicant for a (d) variance must show "special reasons," the statute's positive criteria, and that the variance can be granted "without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan," the statute's negative criteria. Grasso v. Borough of Spring Lake Heights, 375 N.J. Super. 41, 48-49 (App. Div. 2004) (quoting N.J.S.A. 40:55D-70(d)). "The standard for establishing special reasons depends on the type of (d) variance at issue." Id. at 49 (citing Cell S. of N.J.,

Inc. v. Zoning Bd. of Adjustment, 172 N.J. 75, 83 (2002)).  Thus, to obtain a use variance, the applicant must establish both the "positive" and the "negative criteria."  Cell S. of N.J., Inc., 172 N.J. at 82.

The positive criteria are the "special reasons" set forth in the statute. N.J.S.A. 40:55D-70(d); Price, 214 N.J. at 285; Saddle Brook Realty, LLC v. Twp. of Saddle Brook Zoning Bd. of Adjustment, 388 N.J. Super. 67, 75-76 (App. Div. 2006).  The "special reasons" derive from the general purposes of the zoning laws, and can be established under three circumstances:  (1) the proposed use inherently serves the public good; (2) the property owner would suffer an undue hardship if required to use the property in conformance with the permitted uses; or (3) the proposed use would serve the general welfare because the property at issue is particularly suited for the proposed use.  Kinderkamack Rd. Assocs., LLC v. Mayor & Council of Borough of Oradell, 421 N.J. Super. 8, 13 (App. Div. 2011); Saddle Brook Realty, LLC, 388 N.J. Super. at 76.

Use variances "should be granted only sparingly and with great caution since they tend to impair sound zoning."  Kohl v. Mayor & Council of the Borough of Fair Lawn, 50 N.J. 268, 275 (1967).  "Because of the legislative preference for municipal land use planning by ordinance rather than variance,

use variances may be granted only in exceptional circumstances." Kinderkamack Rd. Assocs., LLC, 421 N.J. Super. at 12.

The standards applicable to use variances, FAR variances, and height variances are set forth in N.J.S.A. 40:55D-70(d), which states, in pertinent part:

> The Board of Adjustment shall have the power to:
>
> . . . .
>
> d.  In particular cases for special reasons, grant a variance to allow departure from regulations . . . to permit:  (1) a use or principal structure in a district restricted against such use or principal structure, . . . (4) an increase in the permitted floor area ratio . . . or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure.  . . . .
>
> . . .

Here, Edelman sought to establish the positive criteria through proof the proposed use "promotes the general welfare because the proposed site is particularly suitable for the proposed use." Medici, 107 N.J. at 4.  The question of particular suitability entails a fact-sensitive and site-specific inquiry.  Price, 214 N.J. at 288, 292.  The proposed use must be "peculiarly fitted to the particular location for which the variance is sought." Kohl, 50 N.J. at 279.

"[P]eculiar suitability special reasons" have been found to "exist where, generally, the use is one that would fill a need in the general community, where

there is no other viable location, and where the property itself is particularly well fitted for the use either in terms of its location, topography or shape." Funeral Home Mgmt., Inc. v. Basralian, 319 N.J. Super. 200, 210 (App. Div. 1999). The inquiry is:

> whether the property is particularly suited for the proposed purpose, in the sense that it is especially well-suited for the use, in spite of the fact that the use is not permitted in the zone. Most often, whether a proposal meets that test will depend on the adequacy of the record compiled before the zoning board and the sufficiency of the board's explanation of the reasons on which its decision to grant or deny the application for a use variance is based.
>
> [Price, 214 N.J. at 292-93.]

"Detailed factual findings that distinguish the property from surrounding sites and demonstrate a need for the proposed use may help to establish that the property is 'particularly suitable' for the proposed use and a lack of such findings may be fatal when tested on review." Id. at 288.

As for the negative criteria, they require an enhanced quality of proof by the applicant, as well as clear and specific findings by the zoning board of adjustment, that granting the variance for the proposed use (1) will not cause a substantial detriment to the public good, and (2) will not substantially impair the

24

intent and the purpose of the zone plan and zoning ordinance.  N.J.S.A. 40:55D-70; Price, 214 N.J. at 286; Medici, 107 N.J. at 4, 21.

"Such proofs and findings must satisfactorily reconcile the grant of a use variance with the ordinance's continued omission of the proposed use from those permitted in the zone . . . ."  Medici, 107 N.J. at 4.  "For example, proof that the character of a community has changed substantially since the adoption of the master plan and zoning ordinance may demonstrate that a variance for a use omitted from the ordinance is not incompatible with the intent and purpose of the governing body when the ordinance was passed."  Id. at 21.  However, "[r]econciliation on this basis becomes increasingly difficult when the governing body has been made aware of prior applications for the same use variance but has declined to revise the zoning ordinance."  Id. at 21-22.

The enhanced standard is intended to "narrow to some extent the discretion of boards of judgment in reviewing use-variance appeals for uses that are deliberately excluded by the governing body from those permitted by the zoning ordinance."  Id. at 5.  It also effectuates the legislative "objective of encouraging municipalities to make zoning decisions by ordinance rather than by variance."  Id. at 5, 23; see also Price, 214 N.J. at 285 (noting MLUL's preference for land use planning by ordinance rather than variance, and that

A-0953-23

zoning board may not, by variance, usurp legislative power reserved to municipality's governing body).

"[P]lanning, and not ad hoc decision-making, is the cornerstone of sound governmental policy in this area." Kaufmann v. Planning Bd. for Warren Twp., 110 N.J. 551, 557 (1988). "The requirements of periodic reevaluation of the municipal master plans and development regulations, N.J.S.A. 40:55D-89, -89.1, and of annual reports and recommendations from boards of adjustment, N.J.S.A. 40:55D-70.1, help to ensure government by ordinance and not by variance." Ibid.

To satisfy the enhanced quality of proof on the negative criteria, "[t]he board's resolution should contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the master plan and zoning ordinance, and determined that the governing body's prohibition of the proposed use is not incompatible with a grant of the variance." Medici, 107 N.J. at 23.

### Positive Criteria

First, considering the positive criteria, the resolution extensively addressed the particular suitability analysis and sets forth findings that the proposed development is promoted by the MLUL, N.J.S.A. 40:55D-2(a) - (o).

The Board also found ten special reasons were furthered by approving the application. The Board stressed the subject site has a pre-existing non-conforming use, and the site has "historically operated with an approximate 72 parking space deficiency." The Board noted there would be "significant reduction in overall parking" demands. The Board concluded the proposed development is "less intense" and thus particularly suited to a multi-family development, which is permitted as a conditional use in the MF-75 overlay zone, where this property is situated. The Board found approval of the application will "help improve/secure/promote fire-related safety at the site." Additionally, the Board highlighted that the Belmar Inn "does not satisfy all prevailing FEMA/[f]lood [r]egulations" and "is susceptible to major storm damage due to its proximity to the ocean-front."

The central dispute in this matter regarding site suitability is that the Board acted arbitrarily, capriciously, and unreasonably by comparing the proposed development with the existing rooming house. Other than economics—a more desirable rate of return based upon a larger development than otherwise permitted on the property—and the existence of a pre-existing non-conforming use seen as undesirable, plaintiffs aver Edelman cited nothing unique about the location, topography, shape, or other condition of the property

that would make it particularly suitable for condominiums and unsuited for the permitted uses, such as single-family residences or townhouses, citing <u>Degnan</u>, 210 N.J. Super. at 183-85.

Plaintiffs' reliance on <u>Degnan</u> is misplaced. In <u>Degnan</u>, the subject property was an abandoned sewage treatment plant owned by a public agency. The developer sought a variance to construct eighteen condominiums on land that had no pre-existing use at the time. <u>Id.</u> at 179-80. However, the subject property here is privately not publicly owned, and Edelman sought a variance for a less intense use in contrast to the abandoned, pre-existing nonconforming use in <u>Degnan</u>. Moreover, the Belmar Inn is an active, non-abandoned use, as recognized by the Board, and can operate indefinitely into the future. <u>Degnan</u> is further distinguishable because in that case, the developer had purchased the property whereas in the matter under review, Edelman is a contract purchaser. Therefore, <u>Degnan</u> is not applicable to our analysis.

The court duly found the Board's resolution and consideration of the Belmar Inn's ongoing operation was "merely a recognition of the 'boots on the ground' circumstances" and "absent abandonment" is "an impediment to development of single-family houses . . . ." In addressing this issue, the court reasoned that the <u>Kramer</u> Court rejected the argument that a board must

demonstrate a property cannot be developed as a nonconforming use before it can approve variances.  45 N.J. at 291.  The court was correct in its analysis.

Negative Criteria

After detailed discussions of both negative criteria prongs, the Board's resolution summarized the grant of the variance would not cause substantial detriment to the public good under the first prong:

> Rather, with all due respect to those who oppose the [a]pplication, the permanent elimination/abandonment of the pre-existing nonconforming 40-unit [r]ooming [h]ouse [u]se, and the construction of a 24-[u]nit [c]ondominium [d]evelopment in its place will, in fact, be beneficial for the site, the neighborhood, and the community as a whole.  In fact, the Board [m]embers have concluded the elimination of the 40 room [r]ooming [h]ouse substantially benefits the public good.

Regarding the second negative criteria prong, the Board's resolution concludes the goals and objectives of the master plan are promoted.  In particular, the Board found Edelman's application furthers the master plan's goal of enhancing the residential character of the neighborhood given the rooming house has had negative impacts on the surrounding neighborhood.

The Board also determined the master plan encouraged a reduction in rooming house dwellings within the Borough and "approval of the application will help achieve that goal."  We reject plaintiffs' argument that the Board

29

engaged in "rezoning" by granting Edelman's application because the subject property is located in the MF-75 overlay, which permits a multi-family development as a conditional use. Saliently, the MF-75 overlay was eliminated by an Ordinance after the date the resolution was adopted, and therefore, is of no consequence.

The Board also concluded the grant of the FAR requested by Edelman as a (d)(4) variance was proper because the intensity of the proposed development "will be much less intense than the existing non-conforming [u]ses at the combined site." The Board made detailed findings relative to dedicated parking spaces for each condominium unit owner, while the Belmar Inn offers no off-street parking, the EV credit, stormwater run-off issues, elimination of the rooming house, and noted the new structure "to an extent, maximizes light and air both on the site and to the adjacent properties."

We are satisfied the Board made detailed factual findings justifying the positive and negative statutory requirements. Accordingly, as the court found, the Board's resolution provides "significant detail for its findings" on the positive and negative criteria. We, too, are satisfied that the Board's decision was not arbitrary, capricious, or unreasonable and was amply supported by the record.

A-0953-23

III.

We deal only briefly with plaintiffs' claim that Edelman failed to provide adequate and proper notice to the public in accordance with the MLUL, thereby depriving the Board of jurisdiction to conduct the hearing. Specifically, plaintiffs contend that the notice provided was "misleading" in that it "purposefully downplayed two of the most extreme conditions of the application—the height and FAR" by: (1) not referring to the rooftop amenity deck as a fifth floor, notwithstanding that as originally designed the building included rooftop bathroom facilities; (2) stating that the building would be 42.5 feet high, whereas the highest point, to the rooftop elevator, would be 57.2 feet high; and (3) not including the first-floor garage when calculating the FAR variance, which would bring the FAR from 173% to 250%, whereas only a 50% FAR was permitted. We are unpersuaded.

The record shows that Edelman published notice of its proposed development in The Coast Star,[6] and also provided notice to property owners within 200 feet of the subject property, describing the proposed development as follows:

---

[6] The Coast Star is a newspaper that is part of the Star News Group and "serve[s] the southern Monmouth County area." Star News Group, https://starnewsgroup.com/about-us (last visited Feb. 20, 2025).

> Please take notice that the undersigned has filed an appeal or application for development with the Zoning Board of Adjustment of the Borough of Belmar for variance(s) from the requirements of the Land Use Ordinance so as to permit the applicant, Edelman Investment Group, LLC, contract purchaser of the Belmar Inn, 112-114 12th Avenue, and 108 12th Ave Redevco, LLC, owners of 108 and 108 1/2 12th Avenue, to raze the Belmar Inn and all other structures located on 108 and 108 1/2 12th Avenue and form one lot. Applicant proposes to construct 24 condominiums thereon. The first story will consist of entry, foyer and elevator. The first floor will also have 47 [EV] wired parking stalls. Above the parking story shall be three stories of livable units, serviced by an elevator and two emergency stairwells. The applicant intends to construct an amenity deck on the roof, serviced by the elevator and stairwells. The deck will offer outdoor space for unit holders.

The notice next described the variances and design waivers the applicant was seeking, including the height variance (42.5 feet) and the FAR variance (173%, without garage).

The first Board hearing occurred without objection, with the Board finding the notice was sufficient and "in order," such that it had jurisdiction to proceed. At the second hearing, counsel for the objectors asserted deficiencies in the notice, including that the calculated height of the building did not include the rooftop amenities, and the calculated FAR did not include the parking level. The Board considered the objections, overruled them, and proceeded with its

32

consideration of Edelman's application. The Board reviewed the facts and arguments relating to the adequacy of the notice in its resolution, and concluded that the notice complied with the statute.

The court concluded that the notice was legally sufficient and found the clear and plain language of the notice advised that the proposed development included razing the Belmar Inn, all other structures, and constructing a four-story building with twenty-four condominiums. The notice also described the contents of each floor and the rooftop amenity deck, and identified the variances requested. The court observed:

> [i]t cannot gainfully be argued that an impacted layperson would not be on notice of the developer's plan, nor the variances sought. Any assertion by [p]laintiffs to the contrary is hyper-technical and ignores the governing, commonsense approached adopted in [Perlmart of Lacy, Inc. v. Lacey Twp. Planning Bd., 295 N.J. Super. 234, 238 (App. Div. 1996)].

We agree.

The public notice requirements of the MLUL present a jurisdictional issue. Shakoor Supermarkets, Inc. v. Old Bridge Twp. Planning Bd., 420 N.J. Super. 193, 201 (App. Div. 2011); Perlmart, 295 N.J. Super. at 237. At N.J.S.A. 40:55D-11, the MLUL requires:

Notices pursuant to section 7.1 and 7.2 of this act shall state the date, time and place of the hearing, the nature of the matters to be considered and, in the case of notices pursuant to subsection 7.1 of this act, an identification of the property proposed for development by street address, if any, or by reference to lot and block numbers as shown on the current tax duplicate in the municipal tax assessor's office, and the location and times at which any maps and documents for which approval is sought are available pursuant to subsection 6b.

"[T]he purpose for notifying the public of the 'nature of the matters to be considered' is to ensure that members of the general public who may be affected by the nature and character of the proposed development are fairly apprised thereof so that they may make an informed determination as to whether they should participate in the hearing or, at the least, look more closely at the plans and other documents on file." Perlmart, 295 N.J. Super. at 237-38 (citations omitted). Thus, the notice provided should be understandable to the layperson. Id. at 238.

We are convinced the notice provided in this case complied with the law by accurately describing the proposed development in layperson's terms, including the height of the proposed building, the fact that there would be a rooftop amenity deck, and specifically noting that the FAR calculation did not include the parking area. Moreover, plaintiffs and the general public had a full

A-0953-23

and fair opportunity to advocate for their positions at the six public hearings that occurred over the course of a year.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0953-23